597 S.E.2d 776

**Vivian K. NEWELL, Respondent,**

v.

**TRIDENT MEDICAL CENTER, Appellant.**

and

**William Newell, Respondent,**

v.

**Trident Medical Center, Appellant.**

No. 25815.

Supreme Court of South Carolina.

Heard March 16, 2004.

Decided May 3, 2004.

Rehearing Denied June 24, 2004.

C. Mitchell Brown, Zoe S. Nettles, and Elizabeth H. Campbell, all of Nelson, Mullins, Riley & Scarborough, of Columbia, for Appellant.

W. Jefferson Leath, Jr. and Timothy W. Bouch, both of Leath, Bouch & Crawford, LLP, of Charleston, for Respondents.

PER CURIAM.

This is an unusual informed consent case. The jury returned verdicts against appellant Trident Medical Center (Hospital), finding doctors were the Hospital's actual agents for purposes of obtaining informed consent. We reverse.

## *FACTS*

Respondent Vivian Newell (Vivian) sought medical care from Dr. Thomas for gall bladder problems. Dr. Thomas recommended surgery and Vivian agreed. The surgery took place at Hospital, where Dr. Thomas held staff privileges. At the time of Vivian's surgery, one of Dr. Thomas' partners (Dr. Litton) in the practice known as Tri–County Surgical Associates was Chief of Staff at Hospital.

During Vivian's laparoscopic gall bladder removal surgery, Dr. Thomas severed Vivian's common bile duct rather than the cystic duct, leading to numerous medical complications. Vivian and her husband, respondent William Newell (Husband), sued Dr. Thomas, Tri–County Surgical Associates, and Hospital for battery, negligence, and loss of consortium. Vivian and Husband settled all their claims against Dr. Thomas and Tri–County. The jury trial against Hospital resulted in a verdict for Vivian of $3,500,000 actual damages and $7,000,000 punitive damages, and $100,000 for Husband on his consortium claim. The trial judge set-off these verdicts based on the prior settlements.

As noted at the outset, this case was tried on an informed consent theory. Vivian contended that Dr. Thomas inadequately explained the surgical risk of severing the common

bile duct during laparoscopic gall bladder surgery, and failed to inform her that he would be undergoing elective coronary triple bypass surgery three days after operating on her. Vivian alleged that Dr. Thomas was the Hospital's agent for the purposes of obtaining informed consent and that his failure to do so is attributable to the Hospital. Vivian also contends that since Dr. Thomas' partner, Dr. Litton, was Hospital's Chief of Staff at the time of her surgery, that position combined with his personal knowledge of Dr. Thomas' impending heart surgery gave rise to a separate duty on the part of Hospital to inform Vivian of that operation.

## ISSUE

Was there any evidence that either Dr. Thomas or Dr. Litton was Hospital's agent for purposes of obtaining Vivian's informed consent?

## ANALYSIS

The dispositive issue in this case is whether the trial judge erred in failing to direct a verdict for Hospital because neither doctor was the Hospital's agent for purposes of obtaining Vivian's informed consent. We find that the Hospital was entitled to a directed verdict, and reverse.

The Hospital's "Medical Staff Bylaws" (Bylaws) define "Medical Staff" as "the single organized Medical Staff which includes all duly licensed Physicians and dentists who have been granted Privileges.... The Staff is an integral part of the Health System and is not a separate legal entity." The Bylaws' preamble states in part "the Medical Staff must cooperate with and is subject to the ultimate authority of the Board of Directors."

Vivian introduced into evidence a document created by Hospital entitled "Fundamentals of Consent." In part, this document provides:

INFORMED CONSENT

It is the duty of the physician or surgeon to inform the patient of the nature of the illness, the proposed treatment, the risks and chances involved in the proposed treatment, the alternative treatments, if any, and the risk of failure in

the alternative procedure. The patient must have a true understanding of the procedure and its seriousness. Though there is a duty to inform, there likewise is a duty not to inform which is a matter of judgment to be exercised in each particular situation.

It is not the responsibility of hospital personnel to undertake to inform the patient. This remains the responsibility of the attending physician or surgeon. However, when it is apparent to the hospital personnel that the patient has not been informed, it should be immediately brought to the physician's attention. Some hospitals in concert with the surgeon may wish to document "informed consent" through a form signed by the patient and the physician.

The Hospital's "Medical Staff Rules & Regulations" (Rules & Regs) were also introduced into evidence. The Rules & Regs include this provision:

20. Practitioners shall be responsible for obtaining informed consent prior to treatment. When an adult patient is able to appreciate the nature and implications of his condition and the proposed health care and is able to communicate his decisions in an unambiguous manner, the Physician shall obtain informed consent from the patient prior to treatment. When an adult patient is unable to consent, the Physician shall follow the provisions of the South Carolina Adult Health Care Consent Act, S.C.Code 44–66–10 et. [sic] seq. to determine inability to consent, document the inability to consent, and determine the individual who has priority to make health care decisions for the patient. If the adult patient is unable to consent, the Physician must obtain informed consent from the individual with priority to make health care decisions for the patient unless the situation falls within an exemption as set forth in the Adult Health Care Consent Act. The patient or person with priority must be informed of 1) diagnosis; 2) general nature of the contemplated procedure; 3) the material risks associated with the procedure; 4) probability of success if the procedure is carried out; 5) prognosis if the procedure is not carried out; and 6) alternatives to the procedure. If the treatment requires a written consent form according to Health

System policy, both the patient, or person with priority, and the Practitioner shall sign the consent form affirming that the Practitioner personally obtained informed consent from the patient or person with priority prior to signing the form. Space shall be provided on the form for the Practitioner to document what was explained to the patient or person with priority and that the patient or person with priority understood and agreed to the proposed treatment.

Vivian also introduced a Hospital document titled 'Consent: Obtaining Signature of Patient on Form Entitled "Consent to Operation, Anesthesia & Other Medical Services." ' This Nursing Protocol document provides:

**PURPOSE:**

To establish the nursing protocol in completing the hospital form. It is a statement by the patient and the physician that the procedure is authorized by the patient and that the physician has PREVIOUSLY and INDEPENDENTLY obtained informed consent.

**POLICY:**

South Carolina case law concerning the doctrine of informed consent requires that a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose the following things to a patient who is of sound mind, in the absence of an emergency that warrants immediate medical treatment:

● the diagnosis

● the general nature of the contemplated procedure

● the material risks involved in the procedure

● the probability of success associated with the procedure

● the prognosis if the procedure is not carried out

● the existence of any alternatives to the procedure

To inform a patient of the above information requires the unique knowledge of a physician. Therefore, the hospital and its employees shall not under any circumstances participate in the process of the physician obtaining informed consent from the patient.

The hospital form entitled "Consent to Operation, Anesthesia and Other Medical Services"[1] does not constitute informed consent and is not intended as a part of informed consent.

A signed hospital form is a statement to the hospital by the patient and the surgeon who has obtained informed consent that:

● the surgical procedure is authorized by the patient

● the physician has previously obtained informed consent

● the patient acknowledges and authorizes that if unforeseen conditions arise, additional or different procedures or services may be utilized

● anesthetics may be utilized

● the patient consents to disposal of bodily tissues

● the patient understands the form

This Nursing Protocol goes on to explain the Hospital's internal use of these 'consent forms.'

Finally, Vivian introduced her signed copy of the "Consent to Operation, Anesthesia and Other Medical Services Form" (Surgical Consent Form), promulgated by Hospital, which is the subject of the foregoing Nursing Protocol. This Surgical Consent Form is reproduced below:

Date: _____

Time: _____

I authorize the performance upon _____
(myself or name of patient)
of the following operation _____
(state nature and extent of operation)
to be performed under the direction of Dr. _____,
and/or such assistants as may be selected by him to perform such operation.

I recognize that during the course of the operation, unforeseen conditions may necessitate additional or different procedures or services than those set forth and I further authorize and request that the above-named surgeon and/or his associates, assistants or desig-

---

1. The text of the Consent Form is reproduced in the opinion, *infra*. The form filled out by Dr. Thomas and signed by him and by Vivian in connection with her surgery was introduced at trial.

nees perform such procedures as are, in his professional judgment, necessary and desirable.

I consent to the administration of such anesthetics as may be considered necessary or advisable by the person responsible for such service with the exception of:

_____

(state exception or write 'none')

The nature, purpose and possible consequences of the operation, or procedure, and possible administration of blood and/or blood components and alternative methods of treatment, the risks involved and the possibility of complications have been fully explained to me by my attending physician and/or surgeon. No guarantees or assurances have been made or given by anyone as to the results that may be obtained.

I consent to the disposal by hospital authorities of any tissue or members which may be removed during the course of the operation.

I, THE UNDERSIGNED, HAVE HAD THIS FORM EXPLAINED TO ME AND FULLY UNDERSTAND THE CONTENTS OF THIS AUTHORIZATION.

Signed: _____

(Patient or Authorized Person)

Witness: _____

(relationship)

To be placed on patient's chart.        _____, M.D.

(Surgeon Obtaining Consent)

Vivian contends that medical doctors holding staff privileges at Hospital are the Hospital's agents for purposes of obtaining informed consent from patients. She argues first that the Medical Staff is defined as a part of the Hospital. # 6 Bylaws. The Medical Staff is subject to Hospital's Board of Trustees, Bylaws Preamble, and are required to abide by the Medical Staff Rules & Regs. § 33(10) Bylaws. The Rules & Regs require the practitioners to obtain informed consent. ¶ 20 Rules & Regs. According to Vivian, since the Hospital's Rules & Regs require the Medical Staff to obtain informed consent, and since the Staff is a part of the Hospital, they act as the Hospital's agents when obtaining this consent. In support of these contentions, Vivian relies heavily on what she alleges are inconsistencies and imperfections in the Surgical Consent Form which she refers to, inaccurately, as the "Informed Consent Form."

■ "The test to determine agency is whether or not the purported principal has the *right to control* the conduct of the alleged agent." *Fernander v. Thigpen*, 278 S.C. 140, 293 S.E.2d 424 (1982)(italics in original). Reading the Bylaws, the Rules & Regs, the Nursing Protocol, and the Surgical Consent Form together leads to the conclusion that, under the Hospital's rules and in accord with South Carolina law, obtaining informed consent is a matter solely for the attending physician, to be done within the privacy and sanctity of the physician-patient relationship. *See Hook v. Rothstein*, 281 S.C. 541, 316 S.E.2d 690, *certiorari denied in order expressly approving Court of Appeals' decision*, 283 S.C. 64, 320 S.E.2d 35 (1984) (physician must obtain informed consent before treatment).

To hold, as Vivian urges, that Dr. Thomas was the Hospital's agent for purposes of obtaining informed consent would represent an enormous expansion of this Court's existing hospital-physician agency jurisprudence. *See Osborne v. Adams*, 346 S.C. 4, 550 S.E.2d 319 (2001) (hospital may owe duty to patient who chooses treatment at that facility under § 429 of the Restatement (second) of Torts) *citing Simmons v. Tuomey Reg. Med. Center*, 341 S.C. 32, 533 S.E.2d 312 (2000) (hospital may be liable for independent contractor doctor's negligence under ostensible agency theory). Further, Vivian cites no authority from another jurisdiction that adopts her agency theory as a basis for holding a hospital liable, nor has our independent research revealed any support. Finally, while South Carolina has not explicitly considered this type of agency claim, the reasoning in *Simmons* and *Osborne* preclude a recovery under the actual agency theory advanced by Vivian.

In *Simmons*, this Court held that a hospital might be vicariously liable under an apparent agency theory for the acts of its emergency room physicians, even though those physicians are independent contractors. In order to hold the hospital liable, the injured person must demonstrate:

1) the hospital held itself out to the public by offering to provide services;

2) the injured person looked to the hospital rather than to the individual physician for care; and

3) a similarly situated person reasonably would have believed the doctor treating the patient was a hospital employee.

*Simmons* at 52, 533 S.E.2d at 323 (emphasis supplied).

The *Simmons* Court went on to emphasize:

Our holding does not extend to situations in which the patient is treated in an emergency room by the patient's own physician after arranging to meet the physician there. **Nor does our holding encompass situations in which a patient is admitted to a hospital by a private, independent physician whose only connection to a particular hospital is that he or she has staff privileges to admit patients to the hospital. Such patients could not reasonably believe his or her physician is a hospital employee.** *Id.* at 52, 533 S.E.2d at 323 (emphasis supplied.)

In *Osborne*, the Court reversed a grant of summary judgment to the hospital, finding the plaintiff had made a *prima facie* showing that the hospital could be liable under an apparent agency theory for the negligence of the neonatologists practicing there. The Court noted the plaintiff presented evidence that the hospital had marketed itself as having a specialized neonatal unit; that she had selected the hospital, rather than the doctors practicing there, based on the hospital's representations; and that the hospital's marketing efforts would lead a reasonable person to believe that the physicians were employees of the hospital's specialized unit. The *Osborne* decision cited from *Simmons,* emphasizing the limitations of the apparent agency theory:

The [*Simmons* ] decision was limited, however, "to those situations in which a patient seeks services at the hospital as an institution, and is treated by a physician who reasonably appears to be a hospital employee." [internal citation omitted] The holding did not "encompass situations in which a patient is admitted to a hospital by a private, independent physician whose only connection to a particular hospital is that he or she has staff privileges to admit patients to the hospital." *Id.*

*Osborne* at 8, 550 S.E.2d at 321.

Vivian concedes, as she must, that she cannot meet the *Simmons/Osborne* apparent agency test and dismisses it as

"simply irrelevant." Instead, she argues that Hospital's control of physicians holding staff privileges, as evidenced by the documents recited above, establishes actual agency. If Vivian is correct, then hospitals are potentially more responsible for the acts of admitting physicians than for the actions of physicians who are independent contractors as in *Osborne* and *Simmons*. We find neither precedent nor public policy support such a re-allocation of responsibility and liability between hospitals and physicians with staff privileges. We decline to adopt such a rule, and emphasize that hospital liability for non-employee physician negligence is limited to apparent agency situations. *Osborne, supra; Simmons, supra.*

■ No actual agency relationship regarding informed consent existed between Hospital and Dr. Thomas by virtue of the Hospital's Bylaws, Rules & Regs, Nursing Protocol, and/or Consent Form. Further, the fortuitous happenstance that Dr. Thomas's partner, Dr. Litton, was Chief of the Medical Staff, and was aware of Dr. Thomas' upcoming elective coronary surgery, does not give rise to any duty on the part of the Hospital to inform Vivian of the planned surgery.

## CONCLUSION

We reverse the judgments, finding no agency relationship between the doctors and the Hospital.

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.