748 S.E.2d 625

**Ralph A. FRONEBERGER and Anna M. Froneberger, Appellants,**

v.

**Kirkland Dale SMITH, Janel Elizabeth Smith, Euro Mortgage Bankers, Inc., and Countrywide Bank, FSB, Defendants,**

**Of Whom Euro Mortgage Bankers, Inc. is the Respondent.**

Appellate Case No. 2011–191306.

No. 5168.

Court of Appeals of South Carolina.

Heard Oct. 3, 2012.

Decided Aug. 28, 2013.

38

 

 

40

Lucy L. McDow, of Rock Hill, for Appellant.

Walter Keith Martens, of Hamilton Martens & Ballou, LLC, of Rock Hill, for Respondent.

WILLIAMS, J.

Ralph A. Froneberger and Anna M. Froneberger (collectively, the Fronebergers) appeal the circuit court's order granting summary judgment in favor of Euro Mortgage Bankers, Inc. (Euro) on all but one of their causes of action. The Fronebergers argue the circuit court erred (1) in finding that Kirkland Smith was not Euro's actual or apparent agent, (2) in finding that Janel Smith's actions in furtherance of her husband's investment scheme were outside of her scope of employment, and (3) in improperly dismissing two of their causes of action against Euro that did not relate to the alleged agency. We agree and reverse.

## FACTS

The Fronebergers are a married couple who own a home in Rock Hill, South Carolina. Euro is a New York corporation with its principal place of business in Melville, New York. From 2007 through 2009, Euro was licensed as a mortgage loan broker in South Carolina and employed Janel Smith as a mortgage loan officer. During this time, Mrs. Smith was the sole employee of Euro for both its North Carolina and South Carolina offices. Mrs. Smith is married to Kirkland Smith.

Until her retirement in 2008, Mrs. Froneberger was a counselor for the Catawba Mental Health Center. In March 2008, Mr. Smith was referred to Catawba for a mental health evaluation, and Mrs. Froneberger was assigned to conduct his evaluation. During this evaluation, Mr. Smith engaged Mrs. Froneberger in a discussion about her contemplated retirement. Mr. Smith explained that he was a mortgage broker for Euro and could provide Mrs. Froneberger with an investment plan to fund her retirement. During this discussion, Mr. Smith provided Mrs. Froneberger with a business card, which identified him as the branch manager for Euro's Charlotte office.

That evening, Mrs. Froneberger told her husband about her discussion with Mr. Smith and gave him Mr. Smith's business card. Mr. Froneberger then contacted Mr. Smith and made an appointment to meet Mr. Smith in Charlotte, North Carolina. On March 27, 2008, the Fronebergers traveled to

Charlotte and met Mr. Smith at an office [1] located in a high-rise building on Tryon Street.

At this meeting, Mr. Smith suggested an investment plan that involved the Fronebergers taking out an equity loan from Euro against their home in Rock Hill, "so that [they] could use that money to make some investments" for Mrs. Froneberger's retirement. Mr. Smith suggested that the Fronebergers could invest their loan proceeds with a large investment bank, such as "Merrill Lynch or AIG." The investment plan was premised on the assumption that the returns from their investment portfolio would be greater than the cost of the interest on the mortgage, and the excess could be used for Mrs. Froneberger's living expenses during retirement. The Fronebergers did not make any commitments at this March 27 meeting, indicating to Mr. Smith that they needed to talk about his recommendations before making a decision.

The Fronebergers returned to Charlotte the following day and decided to go forward by applying for a mortgage refinancing through Euro. Mr. Smith and the Fronebergers were the only people present at this second meeting. Mr. Smith had the Fronebergers complete a Uniform Residential Loan Application. This form was later signed by Mrs. Smith as "interviewer" and submitted to Euro's underwriting department in New York. On April 10, 2008, Euro approved the loan application, and Mr. Smith contacted the Fronebergers to convey Euro's acceptance of their application.

On April 11, 2008, both Mr. and Mrs. Smith accompanied the Fronebergers to a meeting with a Smith Barney investment advisor to determine if Smith Barney would invest and manage the funds secured from the refinance loan. Upon arriving at Smith Barney and prior to meeting with a representative, Mrs. Smith excused herself to care for the Smiths'

---

1. The record is unclear as to whether this office was in fact the office for Euro's Charlotte branch. The Fronebergers assert that this office was the office maintained by Euro for their Charlotte branch. Euro does not deny this assertion, but instead highlights that "Mr. Smith's office was not marked with any signs, placards, or other indicia that the office was operated by Euro, and Mr. Smith did not wear any nametag or logo reflecting that he was affiliated with Euro." Throughout the Fronebergers' deposition testimony, they refer to this office as "Mr. Smith's office."

child and did not return. Mr. Smith and the Fronebergers then met with a Smith Barney representative. This representative informed the Fronebergers that Smith Barney did not "do investments with equity home loans." The Fronebergers and Mr. Smith then returned to Mr. Smith's office.

On the way back to the office, Mr. Smith informed the Fronebergers that AIG and Merrill Lynch no longer had programs that would invest mortgage loan proceeds for clients. Immediately following this, Mr. Smith told the Fronebergers that he believed he could manage their money "about as well as" an investment bank. Mr. Smith then told the Fronebergers about several companies that he owned or operated, including his family's trucking business. During this discussion, Mr. Smith would "refer back" to Euro, but never directly told the Fronebergers that Euro had any involvement with the proposed investments.

Ultimately, the Fronebergers decided to go through with Mr. Smith's proposed investment plan, and on April 18, 2008, the Fronebergers withdrew $20,000 from their savings account and delivered these funds to Mr. Smith to invest in the trucking company. Upon receipt of these funds, Mr. Smith executed a promissory note, promising to pay the Fronebergers "the sum of twenty thousand 00/100 dollars ($20,000.00) together with interest thereon in the sum of 5% of principal one thousand dollars ($1,000.00) per month." The note identified "Kirkland Smith" as the "Borrower" and "Ralph A. Froneberger & Martina A. Froneberger" as the "Lender."

Later that day, the refinance loan from Euro was closed at a law office in Rock Hill. Both Mrs. and Mr. Smith went to the closing. However, Mr. Smith stayed in the car with the Smiths' infant child during the closing. Mr. Froneberger testified that Mrs. Smith helped with the closing, but the Fronebergers "thought she was just being helpful [and] didn't know she had anything to do with the business." After paying the closing fees and the $1,083.43 remaining balance on their previous mortgage, the closing yielded $128,432.45.

On May 7, 2008, the Fronebergers gave Mr. Smith a second payment of $20,000. Again, on June 18, 2008, the Fronebergers gave Mr. Smith a third payment for $20,000. Both of these additional payments were to be invested in Mr. Smith's

family owned trucking business. Following each of these additional payments, Mr. Smith executed additional promissory notes. Initially, the Fronebergers received the promised payments from Mr. Smith as returns on their investments. However, beginning in July 2008, the checks from Mr. Smith began to bounce for having "insufficient funds." Shortly thereafter, the payments stopped all together. Despite repeated efforts, the Fronebergers were unable to get Mr. Smith to make further payments or return the money they had invested with him.

## PROCEDURAL HISTORY

As a result of their transactions with the Smiths, the Fronebergers brought suit against Mr. Smith, Mrs. Smith, Euro, and Bank of America,[2] as successor in interest to Euro's mortgage, on June 16, 2009. The Fronebergers filed an amended complaint on December 14, 2009. The Fronebergers sought recovery against the Smiths and Euro jointly for fraud, negligent misrepresentation, conversion, and breach of the South Carolina Unfair Trade Practices Act. The Fronebergers also sought recovery against Euro for negligent hiring and retention of the Smiths, for failure to comply with the attorney preference statute as required by section 37–10–102(a) of the South Carolina Code (2002), for rescission of the mortgage transaction based on common-law fraud, and for rescission or reformation of the mortgage under the South Carolina Consumer Protection Code.

Euro timely answered both the original complaint and the amended complaint. The Smiths, who were pro se, each filed an answer to the original complaint, but they failed to timely answer the amended complaint.[3] In their answers to the Fronebergers' complaints, Mr. and Mrs. Smith admitted Mr. Smith was an employee of Euro.[4] On February 2, 2010, the

---

2. Bank of America was replaced by Countrywide Bank, who is the actual current holder of the Fronebergers' Mortgage, in the amended complaint.

3. Mrs. Smith also provided an untimely answer to the Fronebergers' amended complaint.

4. On three separate occasions in his answer to the Fronebergers' original complaint, Mr. Smith indicates that he acted as an agent or employee of Euro.

circuit court found the Smiths in default for their failure to respond to the amended complaint.

On November 2, 2010, Euro filed a motion for summary judgment with the circuit court. In support of this motion, Euro presented an affidavit from Lisa Vitale, Euro's president and sole stock holder, which stated that (1) Euro did not permit its employees to provide investment advice; (2) Mrs. Smith was employed as a loan originator from mid–2007 through mid–2009; and (3) Euro never employed Mr. Smith or authorized him to hold himself out as its agent. On December 16, 2010, a hearing was held before the circuit court to address this motion. On December 28, 2010, the circuit court granted the motion for summary judgment on all of the Fronebergers' causes of action against Euro, except their attorney preference claim, finding that (1) Euro was not liable for the acts of Mr. Smith under a theory of either actual or apparent authority; (2) Euro was not liable for the actions of Mrs. Smith because any actions relating to her husband's solicitation of money were outside the scope of her authority; and (3) the Fronebergers' damages arose solely from their loans to Mr. Smith and were unrelated to the mortgage loan transaction with Euro.

On January 12, 2011, the Fronebergers filed a Rule 59(e), SCRCP, motion for reconsideration, arguing that (1) sufficient evidence had been presented to preclude summary judgment as to the issues of actual or apparent agency; and (2) Euro's

---

Answering the allegations of Paragraph 8 of the Complaint, Defendant Kirkland Smith admits that Kirkland Smith represented Euro Mortgage at the closing of the loan in Rock Hill, South Carolina.
. . .
Answering the allegations of Paragraph 10 of the Complaint, Defendant Kirkland Smith admits that he was an employee of Euro Mortgage.
. . .
Answering the allegations of Paragraph 16 of the Complaint, Defendant Kirkland Smith admits that his actions towards accomplishing the mortgage loan transaction were made in his capacity as a[sic] office manager and consultant agent of Euro Mortgage.
Additionally, Mrs. Smith provided a similar statement in her untimely answer to the amended complaint when she stated: "Responding to Paragraph 10, Janel Smith admits she was an employee of Euro Mortgage Bankers. Janel Smith is of the opinion or belief that Kirkland Smith was an employee, agent, or representative of Euro."

motion for summary judgment solely addressed agency and therefore should not have affected the Fronebergers' causes of action for rescission and negligent hiring and retention. On January 20, 2011, a second hearing was held before the circuit court to address the Fronebergers' motion to reconsider. On March 10, 2011, the circuit court issued a Form 4 order denying the motion for reconsideration. This appeal followed.

## STANDARD OF REVIEW

"When reviewing a grant of summary judgment, appellate courts apply the same standard applied by the [circuit] court pursuant to Rule 56(c), SCRCP." *Turner v. Milliman,* 392 S.C. 116, 121–22, 708 S.E.2d 766, 769 (2011). "Summary judgment is appropriate when the pleadings, depositions, affidavits, and discovery on file show there is no genuine issue of material fact such that the moving party must prevail as a matter of law." *Id.* at 122, 708 S.E.2d at 769; *see also* Rule 56(c), SCRCP. "To determine whether any triable issues of fact exist, the reviewing court must consider the evidence and all reasonable inferences in the light most favorable to the non-moving party." *McLaughlin v. Williams,* 379 S.C. 451, 455–56, 665 S.E.2d 667, 670 (Ct.App.2008). To withstand a motion for summary judgment in cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence. *Hancock v. Mid–South Mgmt. Co., Inc.,* 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009).

"The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact." *Miller v. Blumenthal Mills, Inc.,* 365 S.C. 204, 220, 616 S.E.2d 722, 730 (Ct.App.2005). "Once the party moving for summary judgment meets the initial burden of showing an absence of evidentiary support for the opponent's case, . . . the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Id.* (citation omitted).

## LAW/ANALYSIS

### I. Agency

The Fronebergers first contend that the circuit court erred in granting summary judgment because sufficient evidence was presented to create genuine issues of material fact regarding the existence of an actual or apparent agency between

Mr. Smith and Euro. Additionally, the Fronebergers argue that the circuit court erred in granting summary judgment based on its finding that the actions of Mrs. Smith were outside the scope of her employment. While we agree with the circuit court's treatment of the alleged apparent agency between Mr. Smith and Euro, we find sufficient evidence exists to withstand summary judgment as to the issue of an actual agency relationship between Mr. Smith and Euro. Further, we find that sufficient evidence exists in the record to withstand summary judgment on the question of whether Mrs. Smith's actions were within the scope of her employment.

## A. Mr. Smith's Apparent Agency

Under South Carolina law, "[t]he elements which must be proven to establish apparent agency are: (1) that the purported principal consciously or impliedly represented another to be his agent; (2) that there was a reliance upon the representation; and (3) that there was a change of position to the relying party's detriment." *Graves v. Serbin Farms, Inc.*, 306 S.C. 60, 63, 409 S.E.2d 769, 771 (1991). "Apparent authority to do an act is created as to a third person by written or spoken words *or any other conduct of the principal* which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him." *Frasier v. Palmetto Homes of Florence, Inc.*, 323 S.C. 240, 244–45, 473 S.E.2d 865, 868 (Ct.App.1996). "Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." *Id.* at 245, 473 S.E.2d at 868. "Moreover, an agency may not be established solely by the declarations and conduct of an alleged agent." *Id.*

The first element of apparent agency can be established by either: (1) affirmative conduct or (2) conscious and voluntary inaction. *See Watkins v. Mobil Oil Corp.*, 291 S.C. 62, 67, 352 S.E.2d 284, 287 (Ct.App.1986) (discussing the elements of apparent agency and finding the first element may be established "by either affirmative conduct or conscious and voluntary inaction"); *Graves*, 306 S.C. at 63, 409 S.E.2d at 771 (the first element of apparent agency requires "that the purported principal *consciously or impliedly represented* an-

other to be his agent." (emphasis added)). Under the first of these two scenarios, the principal makes direct representations to a third party that another has authority to act on his behalf. *See Frasier*, 323 S.C. at 244, 473 S.E.2d at 868 (apparent agency is created by "written or spoken words or any other conduct of the principal" showing consent to allow another to act on a principal's behalf). Under the second, the principal implies authority by passively permitting another to appear to third parties to have authority to act on his behalf. *See R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 434, 540 S.E.2d 113, 118 (Ct.App.2000) ("Such authority is implied where the principal passively permits the agent to appear to a third person to have the authority to act on his behalf."); *Fernander v. Thigpen*, 278 S.C. 140, 143, 293 S.E.2d 424, 426 (1982) ("[A]gency may be implied or inferred and may be circumstantially proved by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal.").

In the instant case, we hold that the Fronebergers have failed to satisfy the first element of apparent agency, which requires "that the purported principal *consciously or impliedly represent* [ ] another to be his agent." *Graves*, 306 S.C. at 63, 409 S.E.2d at 771 (emphasis added).

There is no evidence that Euro, through conduct or manifestations, ever made any direct representation that Mr. Smith was an employee or agent of its company. The Fronebergers stated in their deposition testimony that no one "other than Kirkland Smith ever [told them] that he was employed by Euro Mortgage Bankers." The Fronebergers did not testify to having any contact with Euro's New York office and had little contact with Mrs. Smith. In fact, the Fronebergers testified that they did not even realize Mrs. Smith was an employee of Euro.[5]

Consequently, the only remaining way for the Fronebergers to establish the first element of apparent agency is to demon-

---

5. Mr. Froneberger stated, "[w]e just saw [Mrs. Smith] only as [Mr. Smith's] wife. We didn't even know that she was involved at all." Mrs. Froneberger provided a similar view when she said, "I thought [Mrs. Smith] was just [Mr. Smith's] wife just coming in talking to him in his office."

strate Euro knowingly permitted Mr. Smith to appear to others to be its agent. *See R & G Constr.*, 343 S.C. at 433, 540 S.E.2d at 118 (requiring "acts or conduct" demonstrating a principal "has knowingly ... permitted another to appear to be his agent"). If Euro knew Mr. Smith was holding himself out as its Charlotte office branch manager, was using its office space, and was handing out business cards containing its logo but consciously decided not to stop or correct this behavior, then that inaction could serve as conduct to satisfy the first element. However, we find that the Fronebergers have failed to demonstrate evidence indicating Euro knew Mr. Smith was acting in this manner. Without knowledge of Mr. Smith's conduct, Euro cannot have permitted this behavior with conscious inaction. *See Fernander*, 278 S.C. at 143, 293 S.E.2d at 426 ("[A]gency may be ... proved circumstantially by the conduct of the purported agent exhibiting a pretense of authority *with the knowledge of the alleged principal.*" (emphasis added)). Accordingly, the record contains no evidence that Euro, by any acts or conduct, knowingly caused or passively permitted Mr. Smith to appear to be its agent.

Because this first element fails, we need not consider the remaining elements required to prove apparent agency. We find there is no genuine issue of material fact regarding an apparent agency relationship between Mr. Smith and Euro. Accordingly, the circuit court properly found Euro was entitled to judgment as a matter of law on the apparent agency issue.

### B. Mr. Smith's Actual Agency

■ Although we agree with the circuit court's treatment of the apparent agency issue, we find that there is evidence in the record creating a genuine issue regarding an actual agency relationship between Euro and Mr. Smith, sufficient to survive a motion for summary judgment.

■ "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01 (2006). Generally, "[a]gency is a question of fact." *Gathers v. Harris Teeter Supermarket,*

*Inc.*, 282 S.C. 220, 226, 317 S.E.2d 748, 752 (Ct.App.1984). "[Q]uestions of agency ordinarily should not be resolved by summary judgment where there are *any* facts giving rise to an inference of an agency relationship." *Fernander v. Thigpen*, 278 S.C. 140, 142, 293 S.E.2d 424, 425 (1982) (internal quotation marks omitted). "If there are any facts tending to prove the relationship of agency, it then becomes a question for the jury[,]" and the grant of summary judgment is inappropriate. *Gathers*, 282 S.C. at 226, 317 S.E.2d at 752.

When ruling on a motion for summary judgment, the circuit court should examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" to determine if "there is no genuine issue as to any material fact." Rule 56(c), SCRCP; *see also Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 134, 638 S.E.2d 650, 655 (2006). In the case at hand, the circuit court granted summary judgment to Euro based on its finding that it was "undisputed that Mr. Smith was never an employee of Euro." However, Mr. and Mrs. Smith both indicate in their answers to the Fronebergers' complaints that Mr. Smith was in fact an employee of Euro. These admissions in the Smiths' answers are contrary to Euro's president's affidavit submitted with Euro's motion for summary judgment.

It is well settled in South Carolina that a party "may not rest upon the mere allegations or denials of his pleading" to defeat a motion for summary judgment. Rule 56(e), SCRCP; *see also Strickland v. Madden*, 323 S.C. 63, 68, 448 S.E.2d 581, 584 (Ct.App.1994) (stating "an adverse party may not rely on the mere allegations in his pleadings to withstand a summary judgment motion"). However, in the instant case, the Fronebergers are not merely relying on the allegations of their own pleadings. Instead, they point to the pleadings provided by adverse parties containing admissions that indicate the existence of an agency relationship between Mr. Smith and Euro.

The dissent argues that the Fronebergers failed to present any evidence of an agency relationship because the Smiths' answers "contain only the bare conclusion that [Mr. Smith] was an agent" while failing to provide evidence to support this conclusion. We disagree. Rule 56 of the South Carolina Rules of Civil Procedure requires the circuit court to consider

the submitted pleadings, along with depositions, answers to interrogatories, admissions, and affidavits, when ruling on summary judgment. The Fronebergers directed the circuit court's attention to the Smiths' pleadings as evidence of an actual agency in both their return to summary judgment and their motion for reconsideration. We believe the admissions in the Smiths' pleadings satisfy the mere scintilla of evidence required to withstand summary judgment.[6] Accordingly, the issue of actual agency is a question for the jury. *See Gathers,* 282 S.C. at 226, 317 S.E.2d at 752 ("If there are *any* facts tending to prove the relationship of agency, it then becomes a question for the jury." (emphasis added)); *Fernander,* 278 S.C. at 142, 293 S.E.2d at 425 ("[Q]uestions of agency ordinarily should not be resolved by summary judgment where there are *any* facts giving rise to an inference of an agency relationship." (internal quotation marks omitted)).

In reaching this conclusion, we do not suggest that the Fronebergers have presented sufficient evidence to establish an agency relationship at trial. Ultimately, evidence may demonstrate that Euro and Mr. Smith never entered into an agency relationship. However, given the minimal amount of discovery the parties had conducted at the time summary judgment was granted,[7] we find the Smiths' answers created a mere scintilla of evidence that precluded summary judgment.

Utilizing the mere scintilla of evidence burden, the inconsistencies among the Smiths' answers create a genuine issue of

---

**6.** Additionally, the instant case is distinguishable from the case law cited by the dissent. The admissions in the Smiths' answers were before the circuit court as pleadings of Euro's co-defendants, and not in the pleadings of the party resisting summary judgment. *Cf. Shupe v. Settle,* 315 S.C. 510, 516–17, 445 S.E.2d 651, 655 (Ct.App.1994) (finding an affidavit submitted by the party resisting summary judgment that contained a "conclusory statement as to the ultimate issue in [that] case [was] not sufficient to create a genuine issue of fact for purposes of resisting summary judgment"). We also note that the only evidence that conflicts with the admissions in the Smiths' pleadings is a similar conclusory statement in the affidavit from Euro's president stating that Euro never employed Mr. Smith or authorized him to hold himself out as its agent.

**7.** The record indicates that at the time summary judgment was granted, the only discovery before the circuit court was the Fronebergers' depositions and the affidavit of Euro's president.

material fact that precludes summary judgment.[8] Accordingly, we find the circuit court erred in concluding that the Fronebergers could not proceed under a theory of actual agency.

## C. Mrs. Smith's Scope of Employment

■ The Fronebergers also contend that the circuit court erred in granting summary judgment based upon its finding that the actions of Mrs. Smith in furtherance of her husband's investment scheme were outside the scope of her employment with Euro.

■ "The modern doctrine of *respondeat superior* makes a master liable to a third party for injuries caused by the tort of his servant committed within the scope of the servant's employment." *S.C. Ins. Co. v. James C. Greene & Co.*, 290 S.C. 171, 179, 348 S.E.2d 617, 621 (Ct.App.1986). "An act falls within the scope of the servant's employment if it was reasonably necessary to accomplish the purpose of the servant's employment, and it was done in furtherance of the master's business." *Wade v. Berkeley Cnty.*, 330 S.C. 311, 319, 498 S.E.2d 684, 688 (Ct.App.1998). Accordingly, "the master is liable for the torts of his servant even when the servant acts against the express instructions of his master, so long as the servant acts to further the master's business." *Id.* "What is within the scope of employment may be determined by implication from the circumstances of the case." *Id.* "Any doubt as to whether the servant was acting within the scope of his authority when he injured a third person must be resolved against the master, at least to the extent of requiring that the question be submitted to the jury." *Id.*

In the instant case, the proper question for the circuit court was whether Mrs. Smith's acts facilitating her husband's

---

8. We recognize that one of the Fronebergers' causes of action is fraud, which requires a heightened standard of proof at the summary judgment stage. *See Turner*, 392 S.C. at 125, 708 S.E.2d at 770 (finding that "more than a mere scintilla of evidence must be presented to withstand a motion for summary judgment" when fraud is the cause of action). However, because the circuit court's summary judgment order focused solely on the existence of agency and did not address the merits of the underlying fraud claim, we find it appropriate to apply the mere scintilla burden to the agency question for all causes of action.

investment scheme were: (1) in furtherance of Euro's business and (2) reasonably necessary to accomplish the purpose of her employment. We believe that several of Mrs. Smith's actions, particularly allowing her husband access to Euro's office and signing the loan application that was submitted to Euro's underwriting office, served to further her master's business of lending money and obtaining mortgages and were reasonably necessary to accomplish the purpose of her employment. These actions were also integral in facilitating the transaction between the Fronebergers and her husband.

The dissent argues that the circuit court properly held that the Fronebergers' damages arose solely from the investment transactions with Mr. Smith and were unconnected to the mortgage loan from Euro. However, there is evidence in the record that shows these two transactions were closely related. The Fronebergers' testified at their depositions that their sole purpose in obtaining this mortgage was to fund the investment plan provided by Mr. Smith. This contention is supported by the fact that their prior mortgage with Wells Fargo only had a remaining balance of $1,086.43 at the time they closed on the mortgage. Accordingly, we find the circuit court inappropriately concluded that Mr. Smith's investment scheme and the mortgage loan from Euro were separate and unrelated. Instead, under *Wade*, we find this determination was a question for the jury. 330 S.C. at 319, 498 S.E.2d at 688 ("Any doubt as to whether the servant was acting within the scope of his authority when he injured a third person must be resolved against the master, at least to the extent of requiring that the question be submitted to the jury.").

Based on the foregoing, we find that there are genuine questions of material fact regarding whether the actions of Mrs. Smith were within the scope of her employment that are sufficient to withstand summary judgment. *See Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 (requiring only "a mere scintilla of evidence" to withstand summary judgment in cases applying the preponderance of the evidence burden of proof); *Wade*, 330 S.C. at 319, 498 S.E.2d at 688 ("Any doubt as to whether the servant was acting within the scope of his authority when he injured a third person must be resolved against the master, at least to the extent of requiring that the

question be submitted to the jury."). Therefore, we find that the circuit court erred in granting summary judgment.

Due to the circuit court's errors regarding the grant of summary judgment on the existence of an actual agency with Mr. Smith and the scope of Mrs. Smith's employment, we reverse the circuit court's grant of summary judgment on the Fronebergers' causes of action for fraud, negligent misrepresentation, conversion, and breach of the South Carolina Unfair Trade Practices Act.

## II. Negligent Hiring and Consumer Protection Code Claims

The Fronebergers additionally argue that the circuit court improperly dismissed their causes of action for (1) negligent hiring and retention and (2) rescission based upon unconscionability under Section 37–10–105 the South Carolina Code (2002) (the "Consumer Protection Code") because the circuit court provided no reasoning for dismissing these claims. Furthermore, because these causes of action are separate and distinct from agency, the Fronebergers contend that the court's ruling on agency was not dispositive on the viability of their negligent hiring and Consumer Protection Code claims. We agree.

"[A circuit] court's order on summary judgment must set out facts and accompanying legal analysis sufficient to permit meaningful appellate review." *Bowen v. Lee Process Sys. Co.*, 342 S.C. 232, 237, 536 S.E.2d 86, 88 (Ct.App.2000). "Such an order must include those facts which the circuit court finds relevant, determinative of the issues and undisputed." *Id.* at 237–38, 536 S.E.2d at 88–89 (internal quotation marks omitted). The order should also "provide clear notice to all parties and the reviewing court as to the rationale applied in granting ... summary judgment." *Id.* at 38, 536 S.E.2d at 89 (alteration in original) (internal quotation marks omitted).

In this case, Euro moved for summary judgment on all of the Fronebergers' causes of action. However, their memorandum in support of summary judgment focuses on the nonexistence of an agency relationship between Mr. Smith and Euro. At the hearing for this motion, the Fronebergers argued to the circuit court that at least one of their causes of actions did

not depend on the finding of an agency relationship.[9] The circuit court's order granting summary judgment on six of the seven causes of action brought by the Fronebergers does not contain specific findings or reasoning for the dismissal of any particular cause of action. Instead, the order, under a section entitled "Discussion," generally finds that there was no agency relationship between Mr. Smith and Euro and that the Fronebergers' losses arose solely from their loans to Mr. Smith and were unrelated to their mortgage transaction with Euro. With their motion for reconsideration, the Fronebergers argued that the order failed to address all of their causes of action, specifically pointing out the negligent hiring and consumer protection code claims. The circuit court denied the motion for reconsideration in a Form 4 order.

We find the circuit court has failed to provide adequate reasoning for its grant of summary judgment as to the Fronebergers' claims for negligent hiring and rescission. *See Bowen*, 342 S.C. at 237, 536 S.E.2d at 88 (stating that the circuit court "must set out facts and accompanying legal analysis" to support its grant for summary judgment). The circuit court did not discuss either the undisputed material facts or applicable law which support its grant of summary judgment in relation to Mrs. Smith's hiring and retention or the alleged unconscionable inducement regarding their loan. Neither of these claims turn on the existence of an agency relationship between Mr. Smith and Euro. The circuit court failed to provide either further findings of fact relating to these claims or more defined rationale explaining the grant of summary judgment. We therefore vacate the circuit court's grant of summary judgment for the Fronebergers' claims for negligent hiring and violation of the Consumer Protection Code and remand the matter to the circuit court for an order "identifying the facts and accompanying legal analysis on which it relied in granting Defendants' summary judgment motion" as to these two causes of action.

**CONCLUSION**

The Fronebergers have presented at least a mere scintilla of evidence that there was an actual agency relationship

---

9. Counsel for the Fronebergers stated: "There is one other, your honor, . . . that's not affected by agency or apparent agency and that's the negligent hiring and retention."

between Mr. Smith and Euro. Further, there are genuine questions of fact regarding whether the actions of Mrs. Smith were within the scope of her employment. Hence, the grant of summary judgment based on the court's findings that there was no agency relationship with Mr. Smith and that the acts of Mrs. Smith were outside the scope of her employment was improper. Additionally, the circuit court failed to provide adequate reasoning for its dismissal of the Fronebergers' claims for negligent hiring and rescission under the Consumer Protection Code. Therefore, we reverse the grant of summary judgment on the Fronebergers' causes of action for fraud, negligent misrepresentation, conversion, and breach of the South Carolina Unfair Trade Practices Act. Further, we vacate the circuit court's grant of summary judgment for the Fronebergers' claims for negligent hiring and violation of the Consumer Protection Code and remand the matter to the circuit court for an order identifying the facts and accompanying legal analysis on which it relied in granting Euro's motion for summary judgment as to these two causes of action.

Based on the foregoing, the circuit court's order is

**REVERSED IN PART and VACATED IN PART and REMANDED.**

PIEPER, J., concurs.

FEW, C.J., dissenting.

Kirkland and Janel Smith fraudulently and tortiously misappropriated the Fronebergers' retirement funds. There is no evidence in this record, however, that in doing so either of them acted as an agent of Euro Mortgage Bankers, Inc. Therefore, I would affirm the circuit court's order granting summary judgment to Euro.

### A. Apparent Authority

The majority correctly concludes there is no evidence of agency through apparent authority. In reaching this correct conclusion, however, the majority has confused the elements of apparent authority and has misstated the first element.

"The basis of apparent authority is representations made by the principal to the third party and reliance by the third party

on those representations." *Young v. S.C. Dep't of Disabilities & Special Needs*, 374 S.C. 360, 367, 649 S.E.2d 488, 491 (2007). To analyze the existence of apparent authority, a court must focus on "the relationship between . . . the principal and the third party." *Charleston, S.C. Registry for Golf & Tourism, Inc. v. Young Clement Rivers & Tisdale, LLP*, 359 S.C. 635, 642–43, 598 S.E.2d 717, 721 (Ct.App.2004).

> Based upon these general principles, our courts have required three elements be proven to establish apparent authority: "(1) that the purported principal consciously or impliedly represented another to be his agent; (2) that there was a reliance upon the representation; and (3) that there was a change of position to the relying party's detriment."

359 S.C. at 643, 598 S.E.2d at 721 (quoting *Graves v. Serbin Farms, Inc.*, 306 S.C. 60, 63, 409 S.E.2d 769, 771 (1991)); *see also Simmons v. Tuomey Reg'l. Med. Ctr.*, 341 S.C. 32, 46, 533 S.E.2d 312, 319 (2000) (listing the three elements).

In this case, the circuit court correctly focused on the relationship between the principal and the third party and determined that because there was no evidence Euro made any representation to the Fronebergers, they failed to satisfy the first element of apparent authority. The majority, however, has incorrectly analyzed the circuit court's ruling by repeating language our courts have used to explain and analyze the second element. The majority has used that language as support for its incorrect conclusions that "inaction could serve as conduct," and thus that the first element can be satisfied by evidence of "conscious and voluntary inaction" or that "the principal . . . passively permit[ed] another to appear to third parties to have authority to act on his behalf." The majority is incorrect because the first element cannot be satisfied by inaction. Rather, to survive a motion for summary judgment as to the first element of apparent authority, the plaintiff must produce evidence of some action by the purported principal through which the principal represented to the third party that the alleged agent had authority to act on the principal's behalf.

The majority cites *Watkins v. Mobil Oil Corporation*, 291 S.C. 62, 352 S.E.2d 284 (Ct.App.1986), in support of its argu-

ment that the first element can be proven by "conscious and voluntary inaction" by Euro. For two reasons, I believe the majority incorrectly relies on *Watkins*. First, *Watkins* specifically states that apparent authority *cannot* be proven by "conscious and voluntary inaction." 291 S.C. at 67, 352 S.E.2d at 287 (stating "it is not enough simply to prove ... conscious and voluntary inaction"). Second, *Watkins* relates only to the second element of apparent authority, not the first. In framing our explanation that no evidence of apparent authority existed, we limited the discussion to the second element, specifically stating, "only the factor of reliance warrants discussion...." *Id.* Because *Watkins* specifically states apparent authority *cannot* be proven by inaction, and because the analysis in *Watkins* relates only to the second element of apparent authority, the majority's reliance on *Watkins* is misplaced.

I believe the majority has incorrectly interpreted the word "impliedly." In numerous cases, our courts have stated the first element may be satisfied by evidence showing "the purported principal ... impliedly represented another to be his agent." *See, e.g., Charleston, S.C. Registry for Golf & Tourism, Inc.,* 359 S.C. at 643, 598 S.E.2d at 721 (quoting *Graves,* 306 S.C. at 63, 409 S.E.2d at 771); *see also Simmons,* 341 S.C. at 46, 533 S.E.2d at 319 (stating "the injured patient must establish that [ ] the hospital consciously or impliedly represented the physician to be its agent"). By using the word "impliedly," however, our courts did not intend to allow proof of the first element by inaction. Rather, our courts used the word impliedly to indicate that a principal who made no express representation of authority, but who took action that amounts to an implicit representation of authority, may still be held vicariously liable under the doctrine of apparent authority.

The majority relies on cases such as *R & G Construction, Inc. v. Lowcountry Regional Transportation Authority,* 343 S.C. 424, 540 S.E.2d 113 (Ct.App.2000). The language the majority relies on, however, relates only to the second element of apparent authority. In *R & G Construction,* this court explained that reliance under the second element must be reasonable. 343 S.C. at 433, 540 S.E.2d at 118 (stating "[t]he elements of apparent agency are: ... (2) third party *reason-*

*ably* relied on the representation ..." (emphasis added)). Because the court's focus must be on the relationship between the principal and the third party, a proper evaluation of the reasonableness of the third party's reliance also focuses on that relationship. A court must ask whether "third persons are justified in believing the agent is acting within his authority" based on the "conduct or other manifestations of the principal's consent." 343 S.C. at 434, 540 S.E.2d at 118 (citing *Genovese v. Bergeron,* 327 S.C. 567, 572, 490 S.E.2d 608, 611 (Ct.App.1997)). In this context, we further explained the second element, and particularly how a court may determine whether the third party's reliance is reasonable, stating, "Such authority is implied where the principal passively permits the agent to appear to a third person to have the authority to act on his behalf." *Id.* (citing *Genovese,* 327 S.C. at 572, 490 S.E.2d at 611).

*Genovese* demonstrates that this "passively permits" language relates to the second element of apparent authority, not the first. In *Genovese,* the issue was whether the landlord's employee had authority to inform the tenant she could vacate the leased property without further obligation under the lease. 327 S.C. at 570, 490 S.E.2d at 610. We stated, "It is undisputed that [the employee] was the landlords' agent," and proceeded to consider the "extent of [the employee's] agency" under the doctrine of apparent authority. 327 S.C. at 571, 490 S.E.2d at 610. After reciting evidence supporting the existence of the first element, *id.,* we discussed the dispositive issue—whether the evidence satisfied the second element. We concluded the discussion of apparent authority by holding:

> [W]e find there is some evidence in the record ... that ... the conduct of the landlords in clothing [the employee] with so much authority to manage the property would allow a reasonably prudent person in the tenant's position to believe [the employee] had the authority to release the tenant from her obligations under the lease.

327 S.C. at 572, 490 S.E.2d at 611. Because *Genovese* was decided based on the second element of apparent authority, not the first, the statements quoted from *R & G Construction* that cite *Genovese* for authority are correctly understood to relate to the second element.

The majority has also quoted other opinion excerpts that relate to analysis of the second element, and thus have no place in a discussion of a trial court's ruling on the first element. For example, the majority correctly quotes *Frasier v. Palmetto Homes of Florence, Inc.*, 323 S.C. 240, 244–45, 473 S.E.2d 865, 868 (Ct.App.1996) for the test for analyzing the first element of apparent authority—"Apparent authority to do an act is created as to a third person by written or spoken words *or any other conduct of the principal* . . ."—but in continuing the quotation, the majority enters into the test for the second element—"which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him." The majority further quotes *Frasier*, stating, "the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." *Id.* The majority has also quoted language from *R & G Construction*, 343 S.C. at 433, 540 S.E.2d at 118, to the effect that apparent authority may be established when a principal "has knowingly . . . permitted another to appear to be his agent," and the following language from *Fernander v. Thigpen*, 278 S.C. 140, 143, 293 S.E.2d 424, 426 (1982), "agency may be . . . proved by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal." These are correct statements of law when considered in relation to the second element, but these statements are misplaced in a discussion of the first element.

Thus, the majority's analysis of whether the Fronebergers were reasonably justified in believing Mr. Smith was an agent of Euro and whether Euro knew Mr. Smith was holding himself out as Euro's agent is also misplaced in a discussion of the first element. Further, the majority's contention that the Fronebergers could prove the first element simply by "demonstrat[ing] Euro knowingly permitted Mr. Smith to appear to others to be his agent," and its conclusion, "Without knowledge of Mr. Smith's conduct, Euro cannot have permitted this behavior with conscious inaction," are incorrect. The only issue before this court regarding apparent authority is whether the circuit court correctly found no evidence of the first element. To the extent the majority opinion suggests that the

first element could be satisfied by anything other than evidence of action taken by Euro, the majority opinion is incorrect.[10] Analyzing the first element of apparent authority, the law requires a court to focus on the actions of the purported principal—not the inaction of the principal, not the actions of the alleged agent, and not what the third party might have inferred from the agent's actions. In this case, the Fronebergers produced no evidence of any action by Euro, and the circuit court correctly granted summary judgment on the basis of their failure to satisfy the first element.

I do not intend to suggest that a purported principal's "inaction" is irrelevant to the first element from an evidentiary standpoint. In some cases, certain inaction may assist the factfinder in understanding the significance of the purported principal's action. Thus, inaction may be relevant and admissible under Rules 401 and 402, SCRE. The majority asserts that if Euro knew Mr. Smith held himself out as Euro's Charlotte branch manager, used Euro's office space, and handed out business cards with Euro's logo on them, Euro could be liable if it did nothing to stop Mr. Smith. It is true that evidence of Euro's inaction in the face of this conduct is relevant, and, if the Fronebergers had offered evidence of action taken by Euro, would be admissible at trial. None of that evidence, however, satisfies the first element of apparent authority on a motion for summary judgment. Rather, the Fronebergers must offer evidence that Euro took some action amounting to an express or implied representation to them that Mr. Smith had authority to act as Euro's agent. There is no such evidence in this case, and thus the circuit court correctly granted summary judgment as to the first element of apparent authority.

## B. Actual Authority

The majority incorrectly concludes there is evidence of agency through actual authority. Actual authority is based on the relationship between the purported principal and agent. *See Richardson v. P.V., Inc.*, 383 S.C. 610, 615, 682 S.E.2d 263,

10. The majority's statements that the first element may be proven by inaction, or by anything other than evidence of action taken by Euro, are also dicta because they are not necessary to the resolution of this appeal.

265 (2009) (defining actual authority as authority that is "expressly conferred upon the agent by the principal"). For agency to exist through actual authority, the principal must consent to and intend for the agent to act on his behalf, and likewise, the agent must accept the authority to act on behalf of the principal. *See* Restatement (Third) of Agency § 1.01 (2006) (explaining agency arises when the principal consents "that the agent shall act on the principal's behalf and subject to the principal's control," and the agent consents to act on the principal's behalf); *Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club,* 310 S.C. 132, 145, 425 S.E.2d 764, 773 (Ct.App.1992) ("Agency . . . results from the manifestation of consent by one person to another to be subject to the control of the other and to act on his behalf."). The test to determine whether an agency relationship exists is whether the purported principal has the right to control the conduct of the alleged agent in the performance of his work and the manner in which the work is to be done. *Jamison v. Morris,* 385 S.C. 215, 222, 684 S.E.2d 168, 171 (2009); *Newell v. Trident Med. Ctr.,* 359 S.C. 4, 12, 597 S.E.2d 776, 780 (2004). Thus, an agency relationship based on actual authority exists when a purported principal and an alleged agent mutually consent to the principal controlling the agent in the work the agent has agreed to do on the principal's behalf.

Applying the law to the facts of this case, we must affirm the circuit court unless the Fronebergers offered evidence of a relationship between Euro and Mr. Smith that meets this test for actual authority. To determine whether this evidence exists, courts examine the relationship between the purported principal and the alleged agent. In *Newell,* for example, the court focused on the language of the hospital's bylaws in concluding no actual agency relationship existed between the hospital and a non-employee physician at the hospital. 359 S.C. at 14, 597 S.E.2d at 781. Similarly, the court in *Jamison* looked at the documents governing the parties' relationship to determine whether the purported principal had the right to control the alleged agent in its performance of alcoholic beverage sales. 385 S.C. at 222–23, 684 S.E.2d at 171–72. Here, there is no evidence of any relationship between Euro and Mr. Smith. Therefore, there can be no evidence that Euro and

Mr. Smith mutually consented to Euro controlling him, and there is no evidence of agency through actual authority.

The majority argues the Smiths' answers are evidence of actual authority. Unless the answer is verified, or unless it is the moving party's own answer, it is not evidence that can be considered on summary judgment. The point is proven by the opinion the majority cites for the standard to be applied to a summary judgment motion—*Miller v. Blumenthal Mills, Inc.,* 365 S.C. 204, 616 S.E.2d 722 (Ct.App.2005). The majority omits from its quotation from *Miller* the key language applicable to this case—"the opponent [of summary judgment] cannot simply rest on mere allegations or denials contained in the pleadings." 365 S.C. at 220, 616 S.E.2d at 730.

Moreover, the Smiths' answers do not suffice because they contain only the bare conclusion that Mr. Smith was an agent, with no evidence to support the conclusion. *See Shupe v. Settle,* 315 S.C. 510, 516–17, 445 S.E.2d 651, 655 (Ct.App.1994) (stating a "conclusory statement as to the ultimate issue in a case is not sufficient to create a genuine issue of fact for purposes of resisting summary judgment"). The Smiths' answers contain no evidence of any action by Euro. Thus, there is no evidence that Euro consented to Mr. Smith acting on its behalf and under its control. It makes no difference that the answers were filed by Euro's co-defendants. The answers contain no basis for a factfinder to infer that Euro and Mr. Smith mutually consented to a relationship through which Euro had the authority to control Mr. Smith's conduct. The majority actually defeats its own argument by observing in its section on apparent authority that there is no evidence "indicating Euro knew Mr. Smith was acting" on Euro's behalf. I would affirm the circuit court's order granting summary judgment to Euro.

The majority's reliance on the "minimal amount of discovery" conducted before the summary judgment hearing is also misplaced. By including the reference to discovery, the majority suggests the existence or non-existence of evidence sufficient to overcome a summary judgment motion depends on the extent to which additional discovery could be conducted. However, whether the party opposing a summary judgment motion has had a full opportunity to complete discovery

is a separate legal issue than whether that party met its burden to produce sufficient evidence. The Fronebergers did not move for a continuance of the summary judgment hearing to pursue further discovery and did not argue at the summary judgment hearing or in their appellate brief they were afforded incomplete discovery. *See Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 439 (2003) (stating in order to delay a summary judgment ruling, "the nonmoving party must demonstrate the likelihood that further discovery will uncover additional relevant evidence"); *Degenhart v. Knights of Columbus,* 309 S.C. 114, 118, 420 S.E.2d 495, 497 (1992) (refusing to consider whether "summary judgment was premature because ... discovery [was] outstanding" when appellants "took no steps to protect their interests in this regard"); *Bayle v. S.C. Dep't of Transp.,* 344 S.C. 115, 128, 542 S.E.2d 736, 742 (Ct.App.2001) (holding incomplete discovery issue unpreserved because appellant did not "move for a continuance in which to pursue further discovery"). If the need for more discovery was an issue, the Fronebergers should have requested it. Once the summary judgment question is before the court, the sole question is whether the evidence creates a question of fact for the jury.

## C. Scope of Employment

Likewise, I would affirm the circuit court's finding that Mrs. Smith's actions were not within the scope of her employment. For the purposes of determining whether the doctrine of *respondeat superior* applies, an employee's tortious act is within the scope of his or her employment when it is "reasonably necessary to accomplish the purpose of his [or her] employment *and* in furtherance of the master's business." *Armstrong v. Food Lion, Inc.,* 371 S.C. 271, 276, 639 S.E.2d 50, 52 (2006) (emphasis added). This test requires the employee's actions be (1) tortious, (2) reasonably necessary to accomplish the purpose of the employment, and (3) in furtherance of the employer's business, before the actions may subject the principal to liability.

Thus, the only actions that are pertinent to determining whether Euro is liable under the doctrine of *respondeat superior* are those that were tortious. *See James v. Kelly Trucking Co.,* 377 S.C. 628, 631, 661 S.E.2d 329, 330 (2008)

("The doctrine of *respondeat superior* provides that the employer ... is called to answer for the *tortious acts* of ... the employee, when those acts occur *in the course and scope* of the employee's employment." (emphasis added)). In this case, Mrs. Smith's only tortious actions were those related to the investment transaction. Her act of signing the mortgage loan resulted only in Euro transferring $127,647 to the Fronebergers, which caused them no harm. The Fronebergers suffered no injury until they gave Mr. Smith money, and it was the investment transaction that caused their harm. When we consider just the investment transaction, there is no evidence that Mrs. Smith's act of allowing her husband to use her office to provide investment advice was within the scope of her employment. Euro's business is mortgage lending. Euro does not provide investment advice, nor does it broker investments. Therefore, Mrs. Smith's actions that relate to the investment transaction were not reasonably necessary to accomplish Euro's business of mortgage lending and did not further Euro's business.

The majority argues, however, that Mrs. Smith's actions to obtain the mortgage loan were within the scope of her employment, and subject Euro to liability, because those actions were "integral in facilitating the [investment] transaction between the Fronebergers and [Mr. Smith]." It is true that the fraud on the Fronebergers could not have been perpetrated but for the loan from Euro. However, the Fronebergers' theory of Euro's liability depends on Mr. Smith and Mrs. Smith acting intentionally, not merely negligently,[11] to misappropriate their retirement funds. Therefore, to the extent Mrs. Smith's actions in obtaining the loan were part of her husband's fraud, she was necessarily acting to enable him to misappropriate the Fronebergers' money. Under the majority's theory, therefore, she was not acting in furtherance of Euro's business, but defrauding Euro by exposing it to a loan whose proceeds she

11. The Fronebergers' causes of action against Euro relevant to this appeal are fraud and conversion—both of which require proof of intentional conduct—and negligence. However, Euro cannot be liable for negligence because neither Euro nor Mrs. Smith owed the Fronebergers a duty of due care regarding investment of the proceeds of the loan. Therefore, the Fronebergers can recover from Euro only if they prove Mrs. Smith intentionally participated, within the scope of her employment, in her husband's fraudulent scheme.

intended to help her husband steal. By participating in the theft of the proceeds of the loan, as the majority theorizes, she was depriving Euro of a substantial component of its security. This was not "in furtherance" of Euro's business but, instead, made Euro a victim of fraud. It is simply not possible to hold Euro liable for civil damages by using its role as victim as evidence that the perpetrator of the fraud acted as its agent.

The majority asserts the circuit court erred in concluding the mortgage and investment loan transactions were separate and unrelated because that determination was a question for the jury. I disagree because the evidence in the record conclusively demonstrates the two transactions were independent. The Fronebergers retained control over the loaned money because Euro never restricted how the Fronebergers could spend it, which is demonstrated by the fact that the Fronebergers spent approximately $5,000 of the loan proceeds on personal expenses. Also, the Fronebergers received the mortgage loan after they first entrusted their money to Mr. Smith. Finally, there is no evidence the Fronebergers were obligated to give Mr. Smith any of the loaned money they received. Thus, the two transactions were distinct, and the circuit court correctly found the loans "were independent transactions, unconnected with their mortgage loan with Euro."

## D. Conclusion

I deeply sympathize with the Fronebergers for the loss of their retirement money. The law, however, does not allow a remedy for every wrong. Here, their loss was exclusively the result of Mr. Smith's fraudulent investment scheme, not Euro's mortgage loan. Accordingly, I believe the circuit court properly granted summary judgment.