755 S.E.2d 450

Ann COLEMAN, individually, and as Personal Representative of the Estate of Mary Brinson, Respondent,

v.

MARINER HEALTH CARE, INC., f/k/a Mariner Post Acute Network, LLC, Mariner Health Care Management Company, Mariner Health Central, Inc., Mariner Health Group, Inc., MHC Holding Company, MHC Florida Holding Company, MHC Gulf Coast Holding Company, MHC MidAmerica Holding Company, MHC Rocky Mountain Holding Company, MHC Northeast Holding Company, MHC West Holding Company, MHC Texas Holding Company, MHC MidAtlantic Holding Company, Living Centers–Southeast, Inc., Grancare South Carolina, Inc., Individually and d/b/a Faith Health Care Center, SavaSeniorCare Management, LLC, SavaSeniorCare Administrative Services, LLC, SavaSeniorCare, LLC, SavaSeniorCare, Inc., National Senior Care, Inc., Palmetto Health Care, LLC, Palmetto Faith Operating, LLC, Individually and d/b/a Faith Health Care Center, Ask Holdings, LLC, Leonard Grunstein, an Individual, Murray Forman, an Individual, Boyd P. Gentry, an Individual, Abraham Shaulson, a/k/a Abraham Shavlson, a/k/a A. Shawson, a/k/a Abraham Shawson, an Individual, Avi Klein, an Individual, SC Property Holdings, LLC, SC Faith, LLC, and John Does 1–26, Defendants,

Of whom Mariner Health Care, Inc., f/k/a Mariner Post Acute Network, LLC, Mariner Health Care Management Company, Mariner Health Central, Inc., Mariner Health Group, Inc., MHC Holding Company, MHC Florida Holding Company, MHC Gulf Coast Holding Company, MHC MidAmerica Holding Company, MHC Rocky Mountain Holding Company, MHC Northeast Holding Company, MHC West Holding Company, MHC Texas Holding Company, MHC MidAtlantic Holding Company, Living Centers–Southeast, Inc., Grancare South Carolina, Inc., Individually and d/b/a Faith Health Care Center,

SavaSeniorCare Administrative Services, LLC, SavaSeniorCare, LLC, SavaSeniorCare, Inc., National Senior Care, Inc., Palmetto Faith Operating, LLC, Individually and d/b/a Faith Health Care Center, Leonard Grunstein, an Individual, Murray Forman, an Individual, and Boyd P. Gentry, an Individual, are Appellants.

Appellate Case No. 2011–194946.

No. 27362.

Supreme Court of South Carolina.

Heard Sept. 18, 2013.

Decided March 12, 2014.

348

Sandra L.W. Miller, of Womble Carlyle Sandridge & Rice, LLP, of Greenville, Perry D. Boulier and W. McElhaney White, both of Holcombe Bomar, P.A., of Spartanburg, D. Jay Davis, Jr., William L. Howard and Russell G. Hines, all of Young Clement Rivers, LLP, of Charleston, Carmelo Barone Sammataro and Robert Gerald Chambers, Jr., both of Turner Padget Graham & Laney, P.A., of Columbia, Malcolm J. Harkins, III, of Proskauer Rose, LLP, of Washington, DC, and Lori D. Proctor, of Serpe, Jones, Andrews, Callender & Bell, PLLC, of Houston, Texas, for Appellants.

John S. Nichols, of Bluestein Nichols Thompson & Delgado, LLC, of Columbia, Matthew W. Christian, of Christian and Davis, LLC, of Greenville, Marion S. Fowler, III, of Fowler Law Firm, of Lake City, for Respondent. Kenneth W. Zeller, of Washington, DC, for Amicus Curiae, AARP Foundation Litigation.

Justice PLEICONES.

This is an appeal from orders in a wrongful death suit and a survival action denying appellants' motions to compel arbitration.[1] We affirm, finding as did the circuit court that respondent lacked authority to sign the arbitration agreements (AA), and that she is not equitably estopped to deny their enforceability.

## FACTS

Respondent Ann Coleman (Sister) signed a number of documents in June 2006 following which her sister Mary Brinson, now deceased (Decedent), was admitted to appellant Faith Health Care Center (Facility). Decedent was readmitted to Facility after Sister again signed documents in December 2006. Decedent died on April 30, 2007, and Sister subsequently brought these wrongful death and survival actions against numerous defendants, some of which are appellants.

## ISSUES

I.  Does an individual exercising authority to consent to decisions concerning a patient's health care under the Adult Health Care Consent Act have the capacity to execute a voluntary arbitration agreement?

II. If there is no such authority under the Act, is Sister equitably estopped to deny the validity of the arbitration agreements she executed when Decedent was admitted to the Facility?

## I.  Capacity

██    The question of Sister's authority to execute a voluntary AA is one of statutory interpretation requiring us to determine the nature and scope of authority granted a surrogate by the Adult Health Care Consent Act (Act), S.C.Code Ann. § 44–66–10 et seq. (2002 and Supp.2012). We therefore turn to the Act itself. See e.g. S.C. State Ports Auth. v. Jasper

---

1.  Although this case involves two arbitration agreements, and two suits, the relevant facts and contract terms are identical and the circuit court orders treat the dispositive issues the same. Accordingly, we dispose of all matters in this opinion.

*Cnty.*, 368 S.C. 388, 629 S.E.2d 624 (2006) (when construing statutory term, all sections of the same general statutory law should be read together).

At the time of Decedent's two admissions to Facility she was unable to consent within the meaning of § 44–66–20(6) of the Act. The Act applies to adults[2] who are "unable to appreciate the nature and implications of [their] condition and proposed health care, to make a reasoned decision concerning the proposed health care, or to communicate that decision in an unambiguous manner." *Id.* The Act creates a priority list to determine the persons able to consent on behalf of an incapacitated patient:

   (1) probate court guardian if decision is within the scope of the guardianship;

   (2) attorney-in-fact pursuant to a durable power of attorney executed by the patient pursuant to S.C.Code Ann. § 62–5–501 if within the scope of the attorney-in-fact's power;

   (3) an individual given priority pursuant to another statutory provision;

   (4) spouse, subject to certain qualifications;

   (5) patient's parent or adult child;

   (6) patient's adult sibling, grandparent, or adult grandchild;

   (7) another blood relative the health care professional reasonably believes to have a close relationship with the patient; or

   (8) a person given authority to make health care decisions for the patient by a different statutory provision.

§ 44–66–30(A).

Here, Sister was authorized to make health care decisions for Decedent only because Decedent had no guardian or attorney-in-fact, no other individual had statutory priority, and she had neither a spouse, a parent, nor an adult child.

As the individual with priority under § 44–66–30(A), Sister was authorized to make "decisions concerning [Decedent's] health care. . . ." *Id.* The definitional section of the Act provides:

---

2. It also applies to married or emancipated minors.

"Health care" means a procedure to diagnose or treat a human disease, ailment, defect, abnormality, or complaint, whether of physical or mental origin. It also includes the provision of intermediate or skilled nursing care; services for the rehabilitation of injured, disabled, or sick persons; and the placement in or removal from a facility that provides these forms of care.

§ 44–66–20(1).[3]

In effect, the Act gives Sister two types of authority. First, she could consent, on behalf of Decedent, to the provision or withholding of medical care including placement in a facility which provides such care. Second, the Act authorized Sister to make certain financial decisions on behalf of Decedent, decisions that obligated Decedent to pay for services rendered.

■ The decision to place an incapacitated adult in a nursing facility or a rehabilitative institution is delegated to the surrogate under the Act. Once the decision is made that such placement is appropriate, the surrogate must decide which institution will provide the best care. In making this critical decision, the surrogate must also bear in mind the financial resources of the patient. Thus, the decision to place Decedent in Facility required Sister to use both powers given her by the Act, the medical and the financial, and to make these decisions as the Decedent wished or, if her wishes could not be determined, then in Decedent's best interest. § 44–66–30(H).

In reviewing nursing home options, the surrogate must consider what services the home offers and the cost for such services. For example, some homes might offer laundry services or field trips for a fee, while others include these services as part of the comprehensive charge. The contract terms offered as part of an admission agreement will often require the surrogate to weigh questions that do not directly involve medical treatment or procedures, but are a necessary part of the decision regarding which institution the patient should be placed in.

---

3. 2013 Act No. 39, effective January 1, 2011, altered other definitions in this statute.

■ That the Act contemplates that the surrogate's authority extends primarily to traditional health care decisions, and only secondarily to the financial decisions necessitated by those decisions, is illustrated by other provisions of the Act. These sections illustrate that the purpose of the Act is to insure that the patient's wishes concerning her medical treatment are honored whenever possible, and that decision making by the surrogate is a last resort. For example, § 44–66–30(E) states that no one may consent to "health care decisions" if the responsible medical provider determines that the patient's inability to consent is temporary and that waiting for the patient to regain competency will not result in significant detriment to the patient's health. Further, if the health care professional knows the patient's wishes to be contrary to those expressed by the surrogate, the professional must honor the patient's wishes. S.C.Code Ann. § 44–66–60 (2002); *Harvey v. Strickland*, 350 S.C. 303, 566 S.E.2d 529 (2002). Finally, the Act separates health care from finances in S.C.Code Ann. § 44–66–70 (2002). Subsection (A) provides the surrogate who makes a good faith health care decision "is not subject to civil or criminal liability on account of the substance of the decision." Section 44–66–70(B) provides "A person who consents to health care as provided in Section 44–66–30 does not by virtue of that consent become liable for the costs of the care provided to the patient."

■ Here, Sister was presented with two documents at each of Decedent's admissions: a "RESIDENTIAL ADMISSION AND FINANCIAL AGREEMENT" and an "AGREEMENT FOR ARBITRATION." The admission and financial agreement provides that it "sets forth the terms under which the Facility will provide long term care health services to [Decedent] and how the [Decedent] will pay for such services." Assent to this contract was a condition for Decedent's admission to Facility. On the other hand, the AA was not required for Decedent's admission, contained no provision for medical, nursing, or health care services to be provided for Decedent, and did not require any financial commitment to pay for such services. The scope of Sister's authority to consent to "decisions concerning Decedent's health care" extended to the admission agreement, which was the basis upon which Facility agreed to provide health care and Sister agreed to pay for it.

The separate arbitration agreement concerned neither health care nor payment, but instead provided an optional method for dispute resolution between Facility and Decedent or Sister should issues arise in the future. Under the Act, Sister did not have the capacity to bind Decedent to this voluntary arbitration agreement. We therefore affirm the circuit court's holding that the Act did not confer authority on Sister to execute a document which involved neither health care nor financial terms for payment of such care.[4]

## II. Estoppel

■ Appellants contend that even if Sister lacked capacity to execute the AA under the Act, she is nevertheless equitably estopped to deny the AA's enforceability. The circuit court held there was no estoppel here, and we agree.

---

4. The dissent asserts we read the surrogate's power broadly in finding Sister obligated Decedent to pay for the costs associated with her care at Facility and criticizes us for not also finding authority to sign the AA. Contrary to the dissent's view, we have defined the surrogate's authority strictly by reference to the Act itself, which specifically provides that the surrogate is not financially responsible for the costs associated with the health care decisions she makes on behalf of the incapacitated person. § 44–60–70(B). Second, the dissent is concerned that our reading of the Act is an "inadvisable and undesirable" interpretation because it will deny consumers the choice whether to enter arbitration agreements. We are interpreting a health care surrogacy act, not consumer rights legislation, and the sole question before the Court is the scope of the surrogate's authority. While the power to make decisions other than those involving health care and payment therefore on behalf of the incapacitated person, including authority to enter other types of contracts, may be vested in an attorney-in-fact, a probate court guardian, or another who possesses legal authority, these issues are not before the Court. By focusing on the nature of the disputed contracts here, rather than on the scope of statutory authority, the dissent would rewrite the Act to "empower surrogates to make medical, caretaking, financial *and* dispute resolution decisions." (emphasis in original). This view of the issue leads the dissent to conclude the majority's analysis somehow runs afoul of the rule that arbitration agreements cannot be singled out for special treatment when, in fact, it is the dissent which treats arbitration differently. Forced to acknowledge that Sister's defense here, lack of contractual capacity, may be raised in any contract case, the dissent asserts that our decision "relies on the uniqueness of an agreement to arbitrate." This statement misapprehends the role of facts in an appellate opinion. The sole reason that arbitration agreements are referenced in the majority opinion is because those are the contracts challenged in these appeals as beyond the scope of Sister's statutory authority.

■ Appellants' equitable estoppel argument is premised on their contention that, under state law, the admission agreements and the AAs merged. In South Carolina,

> The general rule is that, in the absence of anything indicating a contrary intention, where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the courts will consider and construe the documents together. The theory is that the instruments are effectively one instrument or contract.
>
> *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.,* 268 S.C. 80, 88, 232 S.E.2d 20, 24 (1977).

Here, the documents were executed at the same time, by the same parties, for the same purposes, and in the course of the same transaction. Unless there is a contrary intention, appellants are correct that there was a merger.

■ The admission agreements contain this language in a section titled "Entirety of Agreement":

> This Agreement, including all Exhibits hereto, and the Arbitration Agreement between the Facility and the Resident, if the parties sign one, supersede all, other agreements, either oral or in writing between the parties, and contain all of the promises and agreements between the parties. Each party to this Agreement acknowledges that no representations, inducements, or promises have been made by any party or anyone acting on behalf of any party, that are not contained in this Agreement or in the Arbitration Agreement. This Agreement may be amended only by a written agreement signed on behalf of the Facility and the Resident.

On its face, this clause recognizes the "separatedness" of the AA and the admission agreement, not a merger of the two contracts. Moreover, the AA could be disclaimed within thirty days of signing while the admission agreement could not, evidencing an intention that each contract remain separate. By their own terms, the contracts between these parties indicated an intent that the common law doctrine of merger not apply. *Klutts Resort, supra.* Even if the "Entirety" clause creates an ambiguity as to merger, the law is clear that any ambiguity in such a clause is construed against the

drafter, in this case, appellants. *See Davis v. KB Home of S.C., Inc.*, 394 S.C. 116, 713 S.E.2d 799 (Ct.App.2011) fn. 4. Since there was no merger here, appellants' equitable estoppel argument was properly denied by the circuit court.

## CONCLUSION

The Act did not authorize Sister, acting as a health care surrogate, to execute the separate, voluntary AAs presented to her by Facility. Further, the predicate for appellants' argument for application of the doctrine of equitable estoppel, that the AA and the admission agreement were merged, is not present here. For these reasons, the decisions of the circuit court are

**AFFIRMED.**

BEATTY, KITTREDGE, and HEARN, JJ., concur.

TOAL, C.J., dissenting in a separate opinion.

Chief Justice TOAL.

I respectfully dissent. As I see it, there are three problems with the majority's interpretation of the definition of "health care" found in section 44–66–20(1) and applied in section 44–66–30(A).[5]

Section 44–66–20(1) defines health care as:

a procedure to diagnose or treat a human disease, ailment, defect, abnormality, or complaint, whether of physical or mental origin. It also includes the provision of intermediate or skilled nursing care; services for the rehabilitation of injured, disabled or sick persons; and the placement in or removal from a facility that provides these forms of care.

S.C.Code Ann. § 44–66–20(1) (2002). Thus, the statutes explicitly permit the surrogate to make all types of medical care decisions on behalf of an incompetent patient, up to and including end-of-life decisions, as well as allowing the surrogate to choose which care facility in which to place the patient.

---

5. Section 44–66–30(A) grants potential surrogates, listed in order of priority, the power to make "decisions concerning [a patient's] health care" if the patient is unable to consent. S.C.Code Ann. § 44–66–30(A) (2002 & Supp.2012).

I agree with the majority that the statutes should be interpreted more broadly than the literal language, and that the surrogate should also have the implied power to make the financial decisions that accompany purely caretaking decisions, such as financially obligating the patient to pay for care services at the chosen facility.

However, my first concern with the majority's interpretation of the statutes is that there is an inherent inconsistency between reading the statutes more broadly than the literal language to allow a surrogate to bind a patient financially to a healthcare contract, but also reading the language narrowly to prohibit the surrogate from binding the patient to arbitration of the same contract. No express statutory language supports either power; rather, the statutes merely reference the surrogate's power to consent regarding "the placement in or removal from a [healthcare] facility. . . ." S.C.Code Ann. § 44–66–20(1). I think it is anomalous to read one of these implied powers into the statute, but not the other. To eliminate such an incongruous result, I would read section 44–66–20(1)'s language regarding "the placement in or removal from a [healthcare] facility" to impliedly encompass not just financial decisions but dispute resolution decisions as well.

Second, I am concerned that the majority's interpretation of the statutes will create undesirable future consequences. The arbitration agreement at issue here is a separate document from the general nursing home residency contract, and patients may exercise their discretion in deciding whether to sign the arbitration agreement prior to receiving care at the nursing home. Using a separate contract for arbitration agreements is conducive to greater freedom of choice for the consumer. It also better protects the nursing home from a contention that the arbitration contract is unconscionable. *See Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 908 N.E.2d 408, 413 (2009) (holding an arbitration agreement that "was voluntary and not a condition of [ ] admission" into the nursing home was not unconscionable). However, the majority's reading of the statutes encourages nursing homes to insert adhesive arbitration clauses into their general residency contracts, instead of (perhaps more desirably) allowing patients to enter into such arbitration agreements at their discretion.

While there is nothing inherently "wrong" with including an arbitration agreement in a nursing home residency contract, I

believe it is more desirable to make arbitration agreements that are healthcare-related, discretionary, and signed by a surrogate just as enforceable as adhesive arbitration agreements. In my opinion, presenting consumers with a separate arbitration agreement should be encouraged because discretionary agreements enable consumers to make a more voluntary, knowing, and informed choice to arbitrate. Therefore, I believe it is inadvisable and undesirable to interpret the statutes in a manner as to encourage nursing homes to utilize adhesive arbitration agreements more frequently than discretionary arbitration agreements.

Third, and most importantly, I believe that the majority's reading of the statutes runs afoul of the United States Supreme Court's directives regarding arbitration. The Supreme Court has repeatedly emphasized that arbitration agreements must be placed on the same footing as all other contracts. *AT & T Mobility, L.L.C. v. Concepcion*, —— U.S. ——, 131 S.Ct. 1740, 1745–46, 179 L.Ed.2d 742 (2011) (explaining that placing arbitration agreements on equal footing with other contracts is consistent with the liberal judicial policy favoring arbitration). In particular, the Federal Arbitration Act (FAA) "requires that states place no greater restrictions upon arbitration provisions than they place upon other contractual terms. . . . Therefore, with few limitations, if a state law singles out arbitration agreements and limits their enforceability, it is preempted." *Saturn Distrib. Corp. v. Williams*, 905 F.2d 719, 722 (4th Cir.1990); *accord Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions."); *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2 [of the FAA]."); Stephen J. Ware, *Arbitration and Unconscionability After Doctor's Associates, Inc. v. Casarotto*, 31 Wake Forest L.Rev. 1001, 1012 (1996) ("Any law that singles out arbitration agreements by making them less enforceable than other contracts is preempted by the FAA.").

I recognize that the defense asserted here—that the surrogate lacked the ability to consent to the arbitration agreement—is a generally applicable defense to all contracts; however, the way the majority applies this defense "takes its meaning precisely from the fact that a contract to arbitrate is at issue." *Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. 2520; *see also Concepcion*, 131 S.Ct. at 1747–48 (explaining that the FAA may preempt generally applicable state-law contract defenses if they are applied in a way that would disfavor arbitration, but not other contracts). It makes no difference whether the majority is unjustly limiting the application of section 44–66–30(A), or whether the General Assembly truly intended to disallow surrogates the ability to consent to arbitration involving healthcare-related contracts; in either case, a surrogate is given the power to enter into a wide variety of healthcare-related contracts on behalf of the patient *except for healthcare-related arbitration agreements*. *See Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. 2520 (holding that a court may not apply state-law in a manner that "rel[ies] on the uniqueness of an agreement to arbitrate ..., for this would enable the court to effect what we hold today the state legislature cannot"). Accordingly, I believe the majority's interpretation is inconsistent with the clear instructions of the Supreme Court, and I therefore would reverse and compel arbitration between the parties.