784 S.E.2d 679

**Mae Ruth Davis THOMPSON, individually and as the appointed Personal Representative of the Estate of Eula Mae Davis, deceased, Respondent,**

v.

**PRUITT CORPORATION d/b/a UHS–Pruitt Corporation; UHS–Pruitt Holdings, Inc.; UHS of South Carolina–East, LLC; United Health Services of South Carolina, Inc.; United Clinical Services, Inc.; United Rehab, Inc.; Rock Hill Healthcare Properties, Inc.; Uni–Health Post Acute Care–Rock Hill, LLC d/b/a UniHealth Post Acute Care–Rock Hill, Appellants.**

**Appellate Case No. 2014–001624.**

**No. 5384.**

Court of Appeals of South Carolina.

Heard Feb. 2, 2016.

Decided March 2, 2016.

Rehearing Denied April 21, 2016.

46

Monteith Powell Todd, Robert E. Horner, John Michael Montgomery, and Alexander Erwin Davis, all of Sowell Gray Stepp & Laffitte, LLC, of Columbia, for appellants.

John Gressette Felder, Jr., of Columbia, and Jordan Christopher Calloway, of Rock Hill, both of McGowan, Hood & Felder, LLC, for respondent.

GEATHERS, J.

In this wrongful death and survival action, Appellants, Pruitt Corporation d/b/a UHS–Pruitt Corporation, UHS–Pruitt Holdings, Inc., UHS of South Carolina–East, LLC, United Health Services of South Carolina, Inc., United Clinical Services, Inc., United Rehab, Inc., Rock Hill Healthcare Properties, Inc., and Uni–Health Post Acute Care–Rock Hill, LLC d/b/a UniHealth Post Acute Care–Rock Hill, challenge the circuit court's order denying their motion to compel arbitration. We affirm.

## FACTS/PROCEDURAL HISTORY

On January 11, 2011, Respondent, Mae Ruth Davis Thompson (Daughter), and her brother, Andrew Phillip Davis (Son), had their mother, Eula Mae Davis (Mother), transferred from Piedmont Medical Center to a nearby nursing home facility owned or operated by Appellant UniHealth Post Acute Care–Rock Hill (UniHealth). A UniHealth employee presented an Admission Agreement, an Arbitration Agreement (AA), and several other documents to Son for his signature on behalf of Mother, who suffered from dementia. Mother was not present at this time as she was in the process of being transported to UniHealth.

Within five hours of being admitted to UniHealth, Mother died as a result of falling out of a bed with a malfunctioning side rail. Subsequently, Daughter filed a wrongful death and survival action against Appellants. Appellants later filed a motion to dismiss Daughter's action and to compel arbitration of Daughter's claims or, in the alternative, to compel arbitration and stay Daughter's action.

The circuit court denied the motion to compel on the ground that Son did not have authority to execute the AA on Mother's

behalf under either common law agency principles or the Adult Health Care Consent Act, S.C.Code Ann. §§ 44–66–10 to –80 ((2002 & Supp.2012)). Appellants filed a motion for reconsideration; however, the circuit court denied the motion. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in concluding Mother's estate could not be bound by the AA under the Adult Health Care Consent Act?

2. Did the circuit court err in concluding Mother's estate could not be bound by the AA under common law agency principles?

3. Did the circuit court err in concluding Mother's estate could not be bound by the AA under a third-party beneficiary theory?

4. Did the circuit court err in concluding Mother's estate could not be equitably estopped from refusing to comply with the AA?

## STANDARD OF REVIEW

"Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual findings, this court will not overrule those findings." *Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 286, 733 S.E.2d 597, 599 (Ct.App.2012).

## LAW/ANALYSIS

### I. Merger

■ Appellants contend the circuit court erred in concluding Mother's estate could not be bound by the AA under the Adult Health Care Consent Act (the Act). Appellants argue the AA "merged" with the Admission Agreement, which Son was authorized to execute under the Act, making both agreements one and the same. We disagree.

Initially, we note this issue is not preserved for our review. Appellants did not raise this issue below; rather, Daughter raised the issue during both motions hearings, citing our

supreme court's recent opinion in *Coleman v. Mariner Health Care, Inc.,* 407 S.C. 346, 350, 755 S.E.2d 450, 453 (2014), and its interpretation of the Act. Appellants addressed the merger concept in the second motions hearing only to respond to Daughter's argument that she could be not be equitably estopped because under the analysis provided by *Coleman,* the AA and the Admission Agreement had not been merged. Appellants attempted to distinguish *Coleman* as follows: "[I]t doesn't discuss equitable estoppel other than to basically discuss merger and say if your argument is premised on merger, we found no merger; therefore, this argument must fail. My argument is not premised upon a merger...."

Based on the foregoing, Appellants are precluded from arguing the doctrine of merger in this appeal. *See Richland Cty. v. Carolina Chloride, Inc.,* 382 S.C. 634, 656, 677 S.E.2d 892, 903 (Ct.App.2009) (holding the appellant was barred on appeal from asserting its argument concerning governmental estoppel because it expressly waived this argument during trial), *aff'd in part, rev'd in part on other grounds,* 394 S.C. 154, 714 S.E.2d 869 (2011). Even if Appellants' merger argument had been properly preserved, we would affirm on the merits.

▪ The Act confers authority on a health care surrogate to consent on the patient's behalf "to the provision or withholding of medical care" and to make financial decisions obligating the patient to pay for the medical care provided. *Coleman,* 407 S.C. at 351–52, 755 S.E.2d at 453.

Where a patient is unable to consent, decisions concerning his health care may be made by the following persons in the following order of priority:

(1) a guardian appointed by the [Probate Court], if the decision is within the scope of the guardianship;

(2) an attorney-in-fact appointed by the patient in a durable power of attorney executed pursuant to [section 62–5–501 of the South Carolina Code (2009 & Supp.2015) ], if the decision is within the scope of his authority;

(3) a person given priority to make health care decisions for the patient by another statutory provision;

(4) a spouse of the patient unless the spouse and the patient are separated pursuant to one of the following:

(a) entry of a pendente lite order in a divorce or separate maintenance action;

(b) formal signing of a written property or marital settlement agreement;

(c) entry of a permanent order of separate maintenance and support or of a permanent order approving a property or marital settlement agreement between the parties;

(5) a parent or adult child of the patient;

(6) an adult sibling, grandparent, or adult grandchild of the patient;

(7) any other relative by blood or marriage who reasonably is believed by the health care professional to have a close personal relationship with the patient;

(8) a person given authority to make health care decisions for the patient by another statutory provision.

S.C.Code Ann. § 44–66–30(A) (2002).

In *Coleman,* our supreme court held an arbitration agreement signed by the surrogate in that case was separate from the agreement to admit the patient to a health care facility and "concerned neither health care nor payment, but instead provided an optional method for dispute resolution between [the facility] and [the patient or her surrogate] should issues arise in the future." 407 S.C. at 353–54, 755 S.E.2d at 454. The court further held, "Under the Act, [the surrogate] did not have the capacity to bind [the patient] to this voluntary arbitration agreement." *Id.* at 354, 755 S.E.2d at 454.

Here, in its order denying Appellants' motion to compel arbitration, the circuit court stated,

The manifest purpose of the Act is to enable contracting parties in a healthcare situation to enter into a binding agreement when express authority has not been conferred upon an agent for that purpose. It further eliminates the need to deal with questions of apparent agency or authority in order to make such a contract binding.

However, *the Act does not confer such authority with respect to an Arbitration Agreement[ ] such as the one in issue in this case. See Coleman v. Mariner Health Care, Inc.,* Supreme Court, Opinion No. 27362 [407 S.C. 346, 755 S.E.2d 450], filed March 12, 2014. As the Arbitration

Agreement does not deal with healthcare decisions, the provisions of the Act do not apply to establish the necessary principal-agent relationship. *Id.*

(emphasis added). We agree with the circuit court's analysis.

■ Like the arbitration agreement in *Coleman,* the AA signed by Son in the present case was separate from the Admission Agreement. Therefore, any authority Son had to sign the AA on Mother's behalf could not come from the Act. *See id.* at 353–54, 755 S.E.2d at 454 (holding that under the Act, the patient's surrogate did not have authority to bind the patient to a voluntary arbitration agreement that was separate from the agreement to admit the patient to a health care facility and "concerned neither health care nor payment").

Appellants argue the terms of the Admission Agreement indicate it either incorporated, or merged with, the AA and thus, Son's authority to execute the Admission Agreement covered the terms of the AA as well. We disagree.

After holding the Act did not authorize the surrogate to sign an arbitration agreement on the patient's behalf, the court in *Coleman* addressed the health care facility's alternative argument that the surrogate was equitably estopped to deny the arbitration agreement's enforceability because that agreement merged with the admission agreement:

The general rule is that, *in the absence of anything indicating a contrary intention,* where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the courts will consider and construe the documents together. The theory is that the instruments are effectively one instrument or contract.

407 S.C. at 346, 355, 755 S.E.2d at 455 (emphasis added) (quoting *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.,* 268 S.C. 80, 88, 232 S.E.2d 20, 24 (1977)). The court then explained the evidence of the parties' intent to keep the two agreements separate by highlighting the admission agreement's recognition of the arbitration agreement as a separate document, i.e., "This Agreement, including all Exhibits hereto, and the Arbitration Agreement ... supersede all other agreements ... and contain all of the promises and agreements between the parties." *Id.* The court also highlighted the arbitration agreement's provision allowing it to be disclaimed

within thirty days and noted the admission agreement did not include such a provision, "evidencing an intention that each contract remain separate." *Id.* Finally, the court stressed that even if the language of the admission agreement created "an ambiguity as to merger, the law is clear that any ambiguity in such a clause is *construed against the drafter*, in this case, [the facility]." *Id.* at 355–56, 755 S.E.2d at 455 (emphasis added).

█ Here, as in *Coleman*, the AA contained language that provided it could be disclaimed within thirty days, yet the Admission Agreement did not include such a provision. Appellants argue the Admission Agreement could have been "disclaimed" at any time by Mother leaving the facility and thus, the right to disclaim the AA does not show the parties intended for the AA to be separate from the Admission Agreement. This is not a valid comparison. Because there are no provisions in the Admission Agreement allowing Mother to disclaim it, leaving the facility would be the only way she could "disclaim" the agreement, whereas the AA allows the patient to disclaim the AA unconditionally. Therefore, Mother's right to disclaim the AA without having to terminate her residency at the facility indicates the parties' intent to keep the AA separate from the Admission Agreement. This is consistent with the AA's statement that its execution was not a condition precedent for being admitted to the nursing home: "The signing of this Agreement is not a precondition to admission, expedited admission, or the furnishing of services to the Patient/Resident by the Healthcare Center[.]" This demonstrates the parties' intent that the two agreements retain their separate identities.

█ Appellants also argue the Admission Agreement incorporates by reference all exhibits to the agreement and the AA is one of the exhibits. However, the Admission Agreement is ambiguous on this point because (1) it does not define the term "exhibit" or cross-reference any specific exhibits and (2) the AA does not include any labels or other language indicating it serves as an exhibit or addendum to the Admission Agreement.[1] Therefore, the Admission Agreement's provision

---

1. In fact, the front page of the AA is labeled "Arbitration Agreement," indicating the parties' intent for it to stand by itself as an independent contract.

incorporating all "exhibits" must be construed against Appellants. *See Coleman*, 407 S.C. at 355–56, 755 S.E.2d at 455 (holding any ambiguity in the patient's admission agreement as to its merger with the arbitration agreement was to be construed against the health care facility); *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 94, 594 S.E.2d 485, 493 (Ct.App.2004) ("A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear."). As to Appellants' contention they relied on Son's written representation he was authorized to sign the AA, we see no true reliance. Appellants represented the AA to be a voluntary agreement that was not a condition to Mother's admission to the facility and was unconditionally revocable within thirty days of execution.

■ Based on the foregoing, we affirm the circuit court's conclusion that the particular AA in the present case did not require the type of decision for which the Act confers authority on a surrogate, i.e., health care or payment for health care.

## II. Common Law Agency

■ Appellants maintain the circuit court erred in concluding no common law agency relationship existed between Son and Mother when Son executed the AA. Appellants argue Son had apparent authority to execute the AA on Mother's behalf. We disagree.

■ To establish apparent authority, the proponent must show (1) "the purported principal consciously or impliedly represented another to be his agent;" (2) the proponent relied on the representation; and (3) "there was a change of position to the [proponent's] detriment." *Froneberger v. Smith*, 406 S.C. 37, 47, 748 S.E.2d 625, 630 (Ct.App.2013) (quoting *Graves v. Serbin Farms, Inc.*, 306 S.C. 60, 63, 409 S.E.2d 769, 771 (1991)).

> Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the *principal* which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him.

*Id.* (emphasis added) (quoting *Frasier v. Palmetto Homes of Florence, Inc.*, 323 S.C. 240, 244–45, 473 S.E.2d 865, 868 (Ct.App.1996)). "Either the principal must intend to cause the

third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." *Id.* (quoting *Frasier*, 323 S.C. at 245, 473 S.E.2d at 868). "Moreover, an agency may not be established solely by the declarations and conduct of an alleged agent." *Id.*

Here, Appellants assert Mother "allowed, passively or otherwise, [Son] to not only sign her into [UniHealth], but also to handle multiple other financial affairs for her." While the evidence indicates Son handled Mother's finances in the years leading up to her admission to UniHealth, the evidence also indicates Mother had dementia prior to being admitted to UniHealth. Therefore, her incapacity prevented her from "consciously or impliedly" representing another to be her agent. *See id.* at 47, 748 S.E.2d at 630 (holding that to establish apparent authority, the proponent must show, among other things, "the purported principal consciously or impliedly represented another to be his agent"); *id.* ("Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief."); *see also Cook v. GGNSC Ripley, LLC,* 786 F.Supp.2d 1166, 1171 (N.D.Miss. 2011) (holding a patient's daughter could not bind the patient through apparent authority because the patient was incapacitated and unable to acquiesce in her daughter's actions).

Further, the authority conveyed by a principal to an agent to handle finances or make health care decisions does not encompass executing an agreement to resolve legal claims by arbitration, thereby waiving the principal's right of access to the courts and to a jury trial. *See Dickerson v. Longoria,* 414 Md. 419, 995 A.2d 721, 736–37 (2010) ("[T]he decision to enter into an arbitration agreement primarily concerns the signatory's decision to waive his or her right of access to the courts and right to a trial by jury."); *id.* at 739 ("The decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement."); *id.* at 736 (concluding the medical and financial decisions of the patient's companion on the patient's behalf suggested the patient may have conferred on his companion "the authority to make health care and financial decisions on his behalf, but no more than that"); *id.* at 735 (holding the patient's companion was the patient's

"agent for purposes of health care and financial decisions, but that the scope of this consensual relationship did not include the authority to bind [the patient] to the arbitration agreement in this case"); *id.* at 735 (holding an agent's statement will bind the principal only if the statement is within the scope of the agency and, therefore, an agent may not enlarge the actual authority by his own acts without the principal's assent or acquiescence); *see also Cook*, 786 F.Supp.2d at 1171 ("An arbitration agreement is not considered to be a health-care decision when admission is not contingent upon its execution."); *cf. Coleman*, 407 S.C. at 354, 755 S.E.2d at 454 ("The separate arbitration agreement concerned neither health care nor payment, but instead provided an optional method for dispute resolution between [the health care facility] and [the patient] or [surrogate] should issues arise in the future. Under the Act, [the surrogate] did not have the capacity to bind [the patient] to this voluntary arbitration agreement."); *id.* ("We therefore affirm the circuit court's holding that the Act did not confer authority on [the surrogate] to execute a document which involved neither health care nor financial terms for payment of such care.").

Based on the foregoing, the evidence does not show that Son had either actual or apparent authority to execute the AA on Mother's behalf. Therefore, the circuit court properly concluded Son did not have the authority to bind Mother to the AA. *See Pearson*, 400 S.C. at 286, 733 S.E.2d at 599 ("Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual findings, this court will not overrule those findings.").

## III. Third–Party Beneficiary

Appellants contend the circuit court erred in concluding that Mother's estate was not bound by the AA under a third-party beneficiary theory. Appellants maintain Mother was a third-party beneficiary of the AA as executed by Son in either his representative or individual capacity and Mother's third-party beneficiary status made the AA binding on her estate. We disagree.

 "A third-party beneficiary is a party that the contracting parties intend to directly benefit." *Helms Realty, Inc. v. Gibson–Wall Co.*, 363 S.C. 334, 340, 611 S.E.2d 485, 488 (2005). However, there can be no third-party beneficiary unless a valid contract exists. *See Dickerson*, 995 A.2d at 742 ("Before one can enforce a contract, however, whether as a party to the contract or as a third-party beneficiary, there must be a contract to enforce."). Here, Son was not authorized to execute the AA on Mother's behalf. Therefore, she could not be the third-party beneficiary of the alleged AA between herself and Appellants.

 As to the AA between Appellants and Son in his individual capacity, "a third-party beneficiary to an arbitration agreement cannot be required to arbitrate a claim unless the third party is attempting to enforce the contract containing the arbitration agreement." *Id.* Here, Daughter is not attempting to enforce the AA on behalf of Mother's estate. Rather, she has asserted tort claims against Appellants arising out of the patient-provider relationship created by the separate Admission Agreement. Further, Mother's diminished mental capacity prevented her from assenting to the AA's terms. Therefore, her estate cannot be bound by the AA. *See Drury v. Assisted Living Concepts, Inc.*, 245 Or.App. 217, 262 P.3d 1162, 1166 n. 5 (2011) ("[U]nless the third-party beneficiary in some way assents to a contract containing an arbitration clause, the contracting parties have waived the beneficiary's right to a jury trial without her consent.").

Appellants also assert that even if Mother was not a third-party beneficiary of the AA, it is still binding on Mother's estate because "the claims of the other beneficiaries of the Estate are inextricably intertwined with [Son's] claims and the members of the group share a close relationship." Appellants cite *Long v. Silver*, 248 F.3d 309, 320 (4th Cir.2001), in support of this argument. In *Long*, the Fourth Circuit held that the facts and claims against a close corporation and its shareholders were "so closely intertwined that [the plaintiff's] claims against the non-signatory shareholders of the [c]orporation [were] properly referable to arbitration even though the shareholders [were] not formal parties" to the agreement containing the arbitration clause. *Id.*

██ Daughter correctly points out that the basis for the Fourth Circuit's holding in *Long* was the "ordinary state-law principles of agency or contract." *Id.* ("A non-signatory may invoke an arbitration clause under ordinary state-law principles of agency or contract."). Further, agency is inherent in the nature of a relationship between a corporation and its shareholders. *See id.* ("In this context, we see little difference between a parent and its subsidiary and a corporation and its shareholders, where, as here, the shareholders are all officers and members of the Board of Directors and, *as the only shareholders*, control all of the activities of the corporation." (emphasis added)). In contrast, the evidence in the present case does not show Son met the legal requirements for an agency relationship with Mother. *See supra.* Therefore, Appellants' "inextricably intertwined" argument has no relevance to the present case.

## IV. Equitable Estoppel

Finally, Appellants assert the circuit court should have concluded that Mother's estate was equitably estopped from refusing to comply with the AA. Appellants argue Mother benefited from the AA because she was admitted to Uni-Health, received medical care, and became capable of enforcing the AA. We disagree.

Initially, we note the recent conflict between the United States Supreme Court and our state courts concerning the application of state law in determining whether a non-signatory is bound by an arbitration agreement. *Compare Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009) (holding that a nonparty to an agreement is entitled to invoke the Federal Arbitration Act (FAA) "if the relevant state contract law allows him to enforce the agreement"), *and id.* at 631, 129 S.Ct. 1896 ("Because 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,' the Sixth Circuit's holding that nonparties to a contract are categorically barred from [FAA] relief was error." (citation omitted)), *with Pearson*, 400 S.C. at 289–90, 733 S.E.2d at 601 (decided in 2012 and holding "[b]ecause the

determination of whether a non[-]signatory is bound by a contract presents no state law question of contract formation or validity, the court looks to the federal substantive law of arbitrability to resolve the question").

Nonetheless, the doctrine of equitable estoppel does not apply to Mother's estate under either South Carolina law or federal substantive law concerning arbitrability. We first examine the doctrine as it has been developed under federal substantive law:

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.

*Pearson,* 400 S.C. at 290, 733 S.E.2d at 601 (emphasis omitted) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir.2000)). In other words, "[w]hen 'a signatory seeks to enforce an arbitration agreement against a non-signatory, the doctrine estops the non-signatory from claiming that he is not bound to the arbitration agreement when he receives a "direct benefit" from a contract containing an arbitration clause.'" *Id.* at 295, 733 S.E.2d at 604 (quoting *Jackson v. Iris.com,* 524 F.Supp.2d 742, 749–50 (E.D.Va.2007)).

Notably, in those opinions addressing equitable estoppel in the arbitration context, the nonsignatory's contractual benefit is not typically an alleged benefit of arbitration such as "avoiding the expense and delay of extended court proceedings" or being "capable of enforcing the [AA]," as touted by Appellants in the present case—rather, the contractual benefit typically arises from another provision of the same contract that includes the arbitration provision. *See Pearson,* 400 S.C. at 296–97, 733 S.E.2d at 605 (ability to work at the defendant's hospital facility and receive payment for work); *see also Int'l Paper Co.,* 206 F.3d at 418 (warranty provisions); *Jackson,* 524 F.Supp.2d at 750 (entitlement to retain a $150,000 payment pursuant to the contract's liquidated damages provision); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999) (lower insurance rates on a yacht

and the ability to sail under the French flag); *Deloitte Norau-
dit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d
Cir.1993) (continuing use of a name).

Here, the AA is not incorporated into the Admission Agree-
ment; therefore, Appellants' assertion that Mother received
benefits under the Admission Agreement, i.e., being admitted
to the facility and receiving medical care, is of no moment.
The two agreements are independent of one another, as
reflected in the language of the AA indicating its execution is
not a condition for being admitted to the nursing home.
Further, any possible benefit emanating from the AA alone is
offset by the AA's requirement that Mother waive her right to
access to the courts and her right to a jury trial. Therefore,
equitable estoppel under federal substantive law has no appli-
cation to the present case.

 Under South Carolina law, the elements of equita-
ble estoppel as to the party to be estopped are

> (1) conduct which amounts to a false representation or
> concealment of material facts, or, at least, which is *calculat-
> ed* to convey the impression that the facts are otherwise
> than, and inconsistent with, those which the party subse-
> quently attempts to assert; (2) *intention*, or at least expec-
> tation, that such conduct shall be acted upon by the other
> party; and (3) *knowledge*, actual or constructive, of the real
> facts. As related to the party claiming the estoppel, they
> are: (1) lack of knowledge and of the means of knowledge of
> the truth as to the facts in question; (2) reliance upon the
> conduct of the party estopped; and (3) action based thereon
> of such a character as to change his position prejudicially.

*Boyd v. Bellsouth Tel. Tel. Co.*, 369 S.C. 410, 422, 633 S.E.2d
136, 142 (2006) (emphases added).

Here, Mother had dementia prior to being admitted to
UniHealth. Therefore, her incapacity prevented her from
forming the intent or having the requisite knowledge to mis-
lead Appellants or to assent to the AA's terms. In their brief,
Appellants side-step this inconvenient fact by substituting
both Daughter, in her individual capacity, and Son for Mother
in the estoppel analysis:

[Son] represented in the contract itself that he was authorized to sign it.... [Daughter] was present while the agreements were signed and made no effort to repudiate [Son's] representations that he was authorized to sign the agreements on [Mother's] behalf.... Now, however, [Daughter] seeks to repudiate these agreements on the basis that [Son] was not authorized to sign them on [Mother's] behalf. [Daughter] should be estopped from taking this contrary position. Additionally, ... the very last sentence of the [AA] notes that in signing the [AA], the Patient/Resident Representative binds both the Patient/Resident and the Patient/Resident Representative. [Son], [Daughter], and the Estate should be estopped from denying that [Son] had the authority to sign the [AA], or that they are bound by it....

This argument necessarily implies that Daughter, in her individual capacity, or Son may serve as the legal equivalent of Mother's estate. However, at least one jurisdiction has rejected this type of premise. In *Dickerson*, the Maryland Court of Appeals addressed an argument identical to Appellants' estoppel argument in the present case:

Respondent is attempting to use equitable estoppel against [the patient's] [e]state based on actions that [patient's companion] took *in her individual capacity*. The fact that [the patient's companion] is *now the personal representative for [the patient's] [e]state* is of no moment; we will not hold this circumstance against [the patient's] [e]state. Simply put, [the patient's] [e]state is the plaintiff in this case, and Respondent has alleged no conduct on the part of [the patient's] [e]state, or by [the patient's companion] in *her capacity as Personal Representative* of [the patient's] [e]state, that has affected Respondent's position. This, too, is a necessary element of an equitable estoppel defense.

995 A.2d at 743 (emphases added). The court also noted the absence of evidence that the owner of the nursing home facility had changed its position for the worse based on the assertion of the patient's companion that she was acting on the patient's behalf when she signed the arbitration agreement. *See id.* Like the facility owner in *Dickerson*, Appellants have failed to show how they have changed their position for the

worse based on Son's representation that he was acting on Mother's behalf when he signed the AA. As we stated previously, the AA was separate from the Admission Agreement, and Appellants represented the AA to be a voluntary agreement that was not a condition to Mother's admission to the facility and was unconditionally revocable within thirty days of execution.

The *Dickerson* court also addressed the facility owner's argument that the doctrine of unclean hands should apply to the patient's estate because the patient's companion was an heir to the estate:

> Respondent notes that [the patient's companion] is 'the heir of [the patient's] [e]state,' suggesting that we should apply the doctrine of unclean hands because [the patient's companion] may benefit if the [e]state's claims against Respondent are successful. We decline to do so. First, as we have explained, we will not hold against the Estate acts that [the patient's companion] may have performed *in her individual capacity*. Second, the [e]state may well have other beneficiaries or creditors. We will not hold [the patient's companion's] *individual acts* against these other entities for the same reasons.

*Id.* at 744 n. 23 (emphases added). Likewise, Appellants in the present case may not hold Mother's estate responsible for any possible misrepresentations Son or Daughter may have made in their individual capacities. Therefore, the circuit court properly rejected Appellants' equitable estoppel theory.

## CONCLUSION

Accordingly, the circuit court's denial of Appellants' motion to compel arbitration is

**AFFIRMED.**

HUFF, A.C.J, and KONDUROS, J., concur.