**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Betty Nanney, by and through her Attorney-In-Fact, Leslie Nanney, Respondent,

v.

THI of South Carolina at Spartanburg, LLC d/b/a Magnolia Manor-Spartanburg, Rusty Flathmann, Laura Anne Winn, and Olishia Gaffney, Appellants.

Appellate Case No. 2020-000500

Appeal from Spartanburg County
Grace Gilchrist Knie, Circuit Court Judge

Unpublished Opinion No. 2023-UP-299
Heard March 16, 2023 – Filed August 23, 2023

**AFFIRMED AS MODIFIED**

Stephen Lynwood Brown, Donald Jay Davis, Jr., Russell Grainger Hines, and Gaillard Townsend Dotterer, III, all of Clement Rivers, LLP, of Charleston, for Appellants.

Gary W. Poliakoff and Raymond Paul Mullman, Jr., both of Poliakoff & Assoc., PA, of Spartanburg; Jordan Christopher Calloway, of Rock Hill, and Whitney Boykin Harrison, of Columbia, both of McGowan Hood Felder

& Phillips, and Edward John Waelde, of Greenville, for Respondent.

---

**PER CURIAM:**  In this negligence action, THI of South Carolina at Spartanburg, LLC, Rusty Flathmann, Laura Ann Winn, and Olishia Gaffney argue the circuit court erred in (1) declining to compel arbitration regarding claims brought by Betty Nanney; (2) declining to order additional discovery on arbitrability; and (3) failing to clarify whether Winn's motion to dismiss was disposed of in the order on arbitrability.  We affirm as modified.

On October 28, 2016, having suffered a ruptured aneurysm in her brain and undergone surgery at another medical facility, Betty Nanney (Betty) was checked into the Magnolia Manor-Spartanburg nursing home (Magnolia Manor).  Magnolia Manor is the business name of THI of South Carolina at Spartanburg, LLC (THI).  After a few days at Magnolia Manor, according to an expert affidavit, Betty began to complain of leg pain.  The pain started by November 1 and continued until an x-ray performed six days later disclosed a broken leg.  A notation from a doctor at the hospital where Betty's leg was treated stated: "Comes from Mag Manor with suspected fall."

Acting through her daughter and attorney-in-fact, Leslie Nanney (Leslie), Betty brought a complaint against THI, Rusty Flathmann (Flathmann), Laura Ann Winn (Winn), and Olishia Gaffney (Gaffney) (collectively, the Defendants) on September 4, 2019.  Betty's causes of action included negligence/recklessness, neglect of a vulnerable adult, and negligent administration.

THI answered on October 9, including as an affirmative defense the fact that it had an arbitration agreement with Betty.  Similar defenses were included in October 11 answers by Flathmann and Gaffney.  Those three parties filed motions to dismiss and compel arbitration on November 11.  Winn filed a motion to dismiss on October 11, arguing she was not working for THI when Betty was injured.

The Defendants' argument that Betty had an arbitration agreement with THI traced back to paperwork filled out at the time of Betty's admission to Magnolia Manor.  That paperwork was completed by her son, Kaileb Horn.  One of the documents Horn signed was an Admission Agreement, which specified that it was to "be governed by and construed in accordance with applicable Federal regulations and those laws of the State in which Facility is located."  It also required the patient's representative to "supply Facility with a copy of any power of attorney, durable power of attorney, durable power of attorney for health care[,] or other legal

documentation permitting him or her to act on Resident's behalf." Finally, section XVIII of the agreement, labeled "**ENTIRE AGREEMENT**," stated in part:

> I/we hereby acknowledge that I/we have read this page and all preceding pages and acknowledge that this Agreement represents the entire agreement and understanding between the parties and supersedes all previous representations, understandings[,] or agreements, oral or written, between the parties and may not be amended except by written agreement of the parties.
>
> By signing below, I/we further acknowledge that I/we have made the above promises and representations in order to induce Facility to enter into this Agreement. The parties further understand that, by signing this Agreement, Facility is relying upon the truthfulness of the promises and representations I/we have made. . . .
>
> The undersigned further acknowledges that he/she has received and read the *Admission Handbook* and other Admissions materials and understand that these documents are made a part of this Agreement by reference herein.

At the same time, Horn signed the Arbitration Agreement, which stated in part:

> It is further understood that in the event of any controversy or dispute between the parties arising out of or relating to Facility's Admission Agreement, or breach thereof, or relating in any way to Resident's stay at Facility, or to the provisions of care or services to Resident, including but not limited to any alleged tort, personal injury, negligence[,] or other claim; or any federal or state statutory or regulatory claim of any kind; or whether or not there has been a violation of any right or rights granted under State law (collectively "Disputes"), and the parties are unable to resolve such through negotiation, then the parties agree that such Dispute(s) shall be resolved by arbitration, as provided by the South Carolina Alternate Dispute Resolution/Mediation Rules. . . .

The parties acknowledge and agree that, because the services and reimbursement thereof effect[] a transaction that involves interstate commerce, the enforcement of this Arbitration Agreement is not subject to the South Carolina Uniform Arbitration Act and shall be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any contrary provision of this Agreement or contrary state law. . . .

This Agreement shall remain in effect for all care rendered at Facility and shall survive any termination or breach of this Agreement or the Admission Agreement. By his/her signature below, the executing party represents that he/she has the authority to sign on Resident's behalf so as to bind the Resident as well as the Representative.

The top of the Arbitration Agreement stated: "***PLEASE READ CAREFULLY***."

According to a December 7, 2019 affidavit by Horn, he "did not say [he] was [Betty's] agent" and "made no statements as to [his] legal authority over [Betty]." Horn also swore that Betty was not present when he signed the forms and she made no representations about whether Horn was empowered to act on her behalf. Betty signed a durable power of attorney designating Leslie as her attorney-in-fact on June 23, 2017.

The circuit court held a hearing on arbitrability on December 16, 2019. On January 7, 2020, the circuit court issued an 18-page order denying the Defendants' attempt to invoke the arbitration agreement. The court held that

no valid arbitration contract between [Betty] and [THI] exists because: (1) Kaileb Horn did not have legal authority to bind Betty Nanney to the Arbitration Agreement; (2) there is a lack of consideration and mutuality under the circumstances; and (3) the affirmative defenses of equitable estoppel, ratification, and third-party beneficiary do not apply under the circumstances.

The Defendants filed a motion to alter, amend, and/or reconsider on January 17, which the circuit court denied on February 13. This appeal followed.

"Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual findings, this court will not

reverse those findings." *Hodge v. UniHealth Post-Acute Care of Bamberg, LLC*, 422 S.C. 544, 554, 813 S.E.2d 292, 297 (Ct. App. 2018); *see also Weaver v. Brookdale Senior Living, Inc.*, 431 S.C. 223, 228, 847 S.E.2d 268, 271 (Ct. App. 2020) ("Whether an arbitration agreement may be enforced against a nonsignatory is a question of law we review de novo, but we will not disturb the trial court's underlying factual findings reasonably supported by the record."). "A trial court's rulings in matters related to discovery generally will not be disturbed on appeal in the absence of a clear abuse of discretion." *Hodge*, 422 S.C. at 576, 813 S.E.2d at 309 (quoting *Stokes-Craven Holding Corp. v. Robinson*, 416 S.C. 517, 536, 787 S.E.2d 485, 495 (2016)).

Initially, we note that all parties agree that non-arbitration issues should be addressed by the circuit court on remittitur. We are proceeding on the anticipation that the circuit court will address Winn's motion on its merits at that point.

"[B]ecause arbitration . . . exists solely by agreement of the parties, a presumption *against* arbitration arises where the party resisting arbitration is a nonsignatory to the written agreement to arbitrate." *Wilson v. Willis*, 426 S.C. 326, 337–38, 827 S.E.2d 167, 173 (2019); *see Weaver*, 431 S.C. at 230, 847 S.E.2d at 272 (stating that arbitration "'is predicated on an agreement to arbitrate because parties are waiving their fundamental right to access to the courts'" (quoting *Wilson*, 426 S.C. at 337, 827 S.E.2d at 173)).

At oral arguments, counsel for the Defendants argued that Horn's legal authority to bind Betty with his signature on the Arbitration Agreement was not a key issue. However, we do not believe that this statement is in line with some of the arguments put forward in the Defendants' brief. In any case, out of an abundance of caution, and because it does impact our disposition of certain issues, we will consider Horn's authority under state law. *See Weaver*, 431 S.C. at 230, 847 S.E.2d at 272 ("State law controls when an arbitration agreement may be enforced against someone who has not signed it."). We find that, with regard to the Arbitration Agreement, Horn did not have the authority to bind Betty.

Horn was legally empowered to sign the *Admission Agreement* on behalf of Betty. The durable power of attorney that Betty signed designating Leslie as her attorney-in-fact was not executed until June 23, 2017, and there are no indications Betty had an agent before that point. As a result, the individuals empowered to act on Betty's behalf for health care purposes would be determined by the Adult Health Care Consent Act. *See* S.C. Code. Ann. §§ 44-66-10 to -80 (2018 & Supp. 2022); § 44-66-30(A)(4) (Supp. 2022) (designating "an adult child of the patient, or if the patient has more than one adult child, a majority of the adult children who are

reasonably available for consultation"); *see also Coleman v. Mariner Health Care, Inc.*, 407 S.C. 346, 350–51, 755 S.E.2d 450, 453 (2014) (applying law when sister signed admission agreement for decedent, then filed wrongful death and survival suit).

However, Horn did not have the authority to sign the *Arbitration Agreement* for Betty. In fact, in *Coleman*, our supreme court rejected a similar argument.

> The scope of Sister's authority to consent to "decisions concerning Decedent's health care" extended to the admission agreement, which was the basis upon which Facility agreed to provide health care and Sister agreed to pay for it. The separate arbitration agreement concerned neither health care nor payment, but instead provided an optional method for dispute resolution between Facility and Decedent or Sister should issues arise in the future. *Under the [Adult Health Care Consent] Act, Sister did not have the capacity to bind Decedent to this voluntary arbitration agreement.*

*Coleman*, 407 S.C. at 353–54, 755 S.E.2d at 454 (emphasis added).

As they concede, Defendants also cannot fall back on apparent agency, which relies on actions and representations by *Betty* (the principal), not *Horn* (the agent). *See Thompson v. Pruitt Corp.*, 416 S.C. 43, 54–55, 784 S.E.2d 679, 686 (Ct. App. 2016) ("Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." (quoting *Froneberger v. Smith*, 406 S.C. 37, 47, 748 S.E.2d 625, 630 (Ct. App. 2013))); *see also id.* at 55, 784 S.E.2d at 686 ("Moreover, *an agency may not be established solely by the declarations and conduct of an alleged agent*." (emphasis added) (quoting *Froneberger*, 406 S.C. at 47, 748 S.E.2d at 630)). There is no indication here that Betty did anything to make the nursing home believe Horn was her agent for the purpose of signing the Arbitration Agreement.

The Defendants contend that the circuit court should have found that the Arbitration Agreement merged with the Admission Agreement. At oral argument, the Defendants argued this was the definitive question. As we will explain, there is no merger.

> The general rule is that, *in the absence of anything indicating a contrary intention*, where instruments are

> executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the courts will consider and construe the instruments together. The theory is that the instruments are effectively one instrument or contract.

*Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 88, 232 S.E.2d 20, 24 (1977) (emphasis added).

The two agreements in this case indicate a contrary intention. For example, the language of the Arbitration Agreement suggests some separation in identity between the two contracts. The Arbitration Agreement states that it "shall survive any termination or breach of this Agreement *or* the Admission Agreement." (emphasis added). This is relevant in two ways.

First, it indicates on its face that the agreements are two separate entities in its use of the disjunctive "or" and its specific reference to the Admission Agreement. In *Coleman*, our supreme court found similar wording displayed the type of contrary intent called for by *Klutts*. The court found that an admissions agreement noting the existence of an arbitration agreement counseled against finding merger:

> On its face, this clause recognizes the 'separatedness' of the [arbitration agreement] and the admission agreement, not a merger of the two contracts. . . . Even if the 'Entirety' clause creates an ambiguity as to merger, the law is clear that any ambiguity in such a clause is construed against the drafter, in this case, appellants.

*Coleman*, 407 S.C. at 355–56, 755 S.E.2d at 455.

Here, the Admission Agreement stated that "*this* Agreement represents *the entire agreement and understanding* between the parties . . . and *may not be amended* except by written agreement of the parties." (emphases added). The catch-all clause providing that "other Admissions materials . . . are made part of this Agreement by reference herein," was not specific enough to indicate to Horn that the Arbitration Agreement was incorporated into the Admission Agreement by reference. *See Thompson*, 416 S.C. at 53–54, 784 S.E.2d at 685 (rejecting a similar argument by finding that "the [a]dmission [a]greement is ambiguous on this point because (1) it does not define the term 'exhibit' or cross-reference any specific exhibits and (2) the [arbitration agreement] does not include any labels or other language indicating it serves as an exhibit or addendum to the [a]dmission

[a]greement," and that "[t]herefore, the [a]dmission [a]greement's provision incorporating all 'exhibits' must be construed against" the nursing home, which drafted the documents).[1]

Additionally, agreements that can be terminated separately do not always merge. *See, e.g., Coleman*, 407 S.C. at 355, 755 S.E.2d at 455 ("[T]he [arbitration agreement] could be disclaimed within thirty days of signing while the admission agreement could not, evidencing an intention that each contract remain separate.").

The Defendants argue that the clause here is different because, in our earlier precedents, the arbitration agreements "provided that they could be disclaimed or revoked within 30 days of their signing (while the corresponding admission agreements contained no such provision)[.]" However, despite the lack of a defined period during which the Arbitration Agreement can be revoked here, the language of that contract clearly contemplates that the two agreements can be terminated separately. This language provides for the Arbitration Agreement to be binding regardless of whether either of the agreements is terminated. If both agreements terminated at the same time, as would be expected in case of a merger, there would be no need for this clarification. The Defendants counter that "revocation"—a term used in some of our earlier cases—and "termination"—the term used in this case—do not have the same legal meaning. *See Revocation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining revocation as "[a]n annulment, cancellation, or reversal, usu. of an act or power"); *Termination*, BLACK'S LAW DICTIONARY (defining termination as "[t]he act of ending something; EXTINGUISHMENT"). Because of this, they argue, the fact that one of the agreements might survive the termination of one or both agreements does not have the same legal import. Setting aside the

---

[1] The Defendants contend that their argument is supported by references to arbitration agreements in some of this court's previous decisions. For example, in *Hodge*, the court referred to an arbitration agreement as among "various documents related to [a decedent's] admission." 422 S.C. at 550, 813 S.E.2d at 295. In *Stott v. White Oak Manor, Inc.*, this court referred to an arbitration agreement as part of "admission documents" or "admission documentation." 426 S.C. 568, 571–72, 828 S.E.2d 82, 84 (Ct. App. 2019). However, merger was not an issue in *Stott*, and the *Hodge* court expressly held that "the [a]dmissions [a]greement and [a]rbitration [a]greement did not merge." 422 S.C. at 563, 813 S.E.2d at 302. It does not appear from *Hodge* that the Arbitration Agreement in that case contained the same language regarding "Admissions materials" as the agreement before us. Still, we do not think the phraseology in either *Hodge* or *Stott* was intended to become the legal standard for what counts as admission paperwork in nonspecific contracts across the state.

metaphysical question of how an agreement can survive its own termination, we do not see this distinction as a material one. The Arbitration Agreement could exist even if the Admission Agreement terminated; an intent for the agreements to function separately can easily be inferred from that fact.

Furthermore, by their respective terms, the Admission Agreement and the Arbitration Agreement are to be considered under different bodies of law—the former under the laws of South Carolina, the latter under the FAA. Our court has previously found that such provisions weigh against merger. *See Hodge*, 422 S.C. at 562–63, 813 S.E.2d at 302 (finding no merger for several reasons, including the fact that "the [a]dmissions [a]greement indicated it was governed by South Carolina law, whereas the [a]rbitration [a]greement stated it was governed by federal law").[2] Considering another factor found significant by the *Hodge* court, the documents were paginated separately. *See id.* at 562, 813 S.E.2d at 302 ("Further, each document was separately paginated and had its own signature page.").

This court recently came to the same conclusion in *Estate of Solesbee by Bayne v. Fundamental Clinical & Operational Services, LLC*. 438 S.C. 638, 885 S.E.2d 144 (Ct. App. 2023), *petition for cert. filed*. There, our court held that

> the Admission Agreement provides it is governed by South Carolina law, and the Arbitration Agreement provides it is governed by federal law. The Arbitration Agreement recognized the two documents were separate, stating the Arbitration Agreement "shall survive any termination or breach of this Agreement or the Admission Agreement." The Arbitration Agreement is silent as to whether it could be revoked, but the Admission Agreement provides, "Resident and/or his/her legal representative may terminate this Agreement at any time, upon written notice to Facility." The Admission Agreement and Arbitration Agreement were separately paginated and had their own signature pages. . . . Thus,

---

[2] The Defendants argue in their brief that "[e]ssentially, both instruments provide that South Carolina law applies except where displaced by federal law." That is not so. The Arbitration Agreement includes a statement that it "*is not subject to the South Carolina Uniform Arbitration Act* and shall be governed by the Federal Arbitration Act . . . , *notwithstanding any contrary provision of the Agreement or contrary state law*." (emphases added).

> like the *Coleman* and *Hodge* courts, we find there was no merger in this case and Magnolia's equitable estoppel argument was properly denied.

*Id.* at 648–49, 885 S.E.2d at 149.

Because these considerations control whether the Arbitration Agreement bound Betty, we decline to reach Defendants' remaining issues on that point. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that the "appellate court need not address remaining issues when disposition of prior issue is dispositive" (citing *Whiteside v. Cherokee Cnty. Sch. Dist. No. One*, 311 S.C. 335, 428 S.E.2d 886 (1993))).

## II.   DISCOVERY ISSUES

The Defendants additionally argue that the circuit court should have allowed them to conduct discovery relevant to arbitrability, especially given Horn's late-breaking affidavit undermining claims of agency.

The Defendants abandoned this issue on appeal. Their primary brief before this court offers only (1) authority regarding the theories they speculate that they might be able to prove with further discovery and (2) eloquent pleas about an "impossible Catch-22" or scenarios that "cannot be the case" or are "patently unjust" and "a violation of the FAA's requirement that arbitration agreements must be placed on equal footing with other contracts." What this section of the brief lacks is any authority for the proposition that the circuit court erred in its determination about discovery. *See First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) ("Appellant fails to provide arguments or supporting authority for his assertion. Thus, he is deemed to have abandoned this issue."); *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct. App. 2001) ("South Carolina law clearly states that short, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review."); *see also Est. of Solesbee*, 438 S.C. at 650–51, 885 S.E.2d at 150 ("Magnolia cites no authority for how it claims the court erred, and the record does not contain any discovery requests Bayne ignored or any subpoenas to which she objected. . . . Because we find the trial court correctly held there was no merger of the Agreements and Magnolia's equitable estoppel argument was properly denied, we also find the court did not err in denying [Magnolia's] request for further discovery when it would not have changed the result."). Further, as in *Estate of Solesbee*, nothing Defendants might have discovered would warrant a finding of arbitrability.

For the foregoing reasons, we affirm the circuit court's order with the caveat that Winn's motion for dismissal should receive a ruling on the merits.

**AFFIRMED AS MODIFIED.**

**WILLIAMS, C.J., and GEATHERS and VERDIN, JJ., concur.**